JUDGE ENGELMAYER



**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In the Matter of the Arbitration
Between

TUBE CITY IMS, LLC

                        Petitioner,

   -against-

ANZA CAPITAL PARTNERS LLC,

                      Respondent.

Case No. 14 CV 1783

**PETITION TO CONFIRM**
**ARBITRATION AWARD**

Petitioner Tube City IMS, LLC, by its undersigned attorneys, petitions the Court to confirm an arbitration award and grant petitioner prejudgment interest, alleging as follows:

**THE PARTIES AND JURISIDCTION**

    1.     Petitioner Tube City IMS, LLC ("Tube City" or "Petitioner") is a limited liability company organized under Delaware law.

    2.     As a limited liability company, Tube City's citizenship is determined by its members.  Tube City has one member, Tube City IMS Corporation, which is a Delaware corporation with a principal place of business in Glassport, Pennsylvania.

    3.     Petitioner Tube City is thus a citizen of Delaware and Pennsylvania.

    4.     Respondent Anza Capital Partners LLC ("Anza Capital") is a limited liability company organized under Delaware law with a principal place of business in New York, New York.

    5.     As a limited liability company, Anza's citizenship is determined by its members. Upon information and belief, Anza Capital has one member, Joseph Anza, who is a citizen of Connecticut.

    6.     Respondent Anza Capital is thus a citizen of Connecticut.

7.      This Court has jurisdiction over this Petition pursuant to 28 U.S.C. § 1332(a)(2) because the Petitioner and Respondent are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interests and costs.

8.      Venue is proper in this court pursuant to Section 9 of the Federal Arbitration Act because the arbitration award that is the subject of this Petition was rendered in this district.

## FACTUAL BACKGROUND

9.      On October 5, 2012 Petitioner filed a request for arbitration with the International Chamber of Commerce's International Court of Arbitration.

10.      The arbitration was captioned *Tube City IMS, LLC v. Anza Capital Partners LLC* and assigned case number 18991/VRO/ARG (the "Arbitration").

11.      The Arbitration arose from an agreement between the parties, the Sales and Purchase Contract dated March 9, 2010 (the "Agreement") for the purchase of certain scrap metal goods. A true copy of the Agreement is attached hereto as **Exhibit A**.

12.      Pursuant to the Agreement, Petitioner purchased the scrap metal goods from Respondent, and Respondent shipped the goods from Puerto Rico and the Dominican Republic to Taiwan.

13.      In April 2010, Respondent issued three invoices to Petitioner totaling $90,703.94.

14.      In May 2010, Petitioner paid Respondent $90,703.94.

15.      In June 2010, Petitioner paid Respondent another $90,703.94, inadvertently remitting payment for the three invoices a second time.

16.      Despite Petitioner's repeated attempts to recover the overpayment, Respondent refused to return the funds to Petitioner.

2

17.     Article 13 of the Agreement provides that any unresolved disputes between the parties are to be "submitted to the International Chamber of Commerce in New York." (*See* Exhibit A at 4.)

18.     Article 13 of the Agreement further provides that "the losing party will pay the arbitration fee" and that "the award of arbitration shall be final and binding on both parties." (*Id.*)

19.     Petitioner commenced the Arbitration to recover $90,703.94, the amount of Petitioner's overpayment improperly retained by the Respondent, as well as costs and fees.

20.     The Arbitration tribunal consisted of a single arbitrator, Emma Lindsay, Esq. of Simpson Thacher & Bartlett LLP.

21.     A hearing took place on August 1, 2013.

22.     Pursuant to Article 14 of the Agreement, the tribunal applied "the laws of New York State . . . interpreted in accordance with the rules of the International Chamber of Commerce . . ." (*See* Exhibit A at 4.)

23.     On February 19, 2014 the tribunal issued a Final Award (the "Award"). A true copy of the Award is attached hereto as **Exhibit B**.

24.     The tribunal found that Petitioner paid $90,703.94 in excess of the invoices issued by Respondent and ordered Respondent to pay that amount to Petitioner "*forthwith upon notification of this award.*" (*See* Exhibit B at 22-23.)

25.     In addition, the Award granted "[t]he costs of the arbitration fixed by the ICC Court in the sum of $50,000.00" and Petitioner's "reasonable legal and other costs in the sum of $87,022.00." (Exhibit B at 23.)

26.     In total, the tribunal awarded the Petitioner the sum of $227,725.94.

27.     To date, Respondent has not remitted any payment to Petitioner or otherwise satisfied any portion of the Award.

28.     This Petition is authorized under Section 9 of the Federal Arbitration Act which provides in pertinent part that the prevailing party in an arbitration may apply for an order confirming the award, and that the court "must grant such an order unless the award is vacated, modified, or corrected" as provided elsewhere in the Act.

29.     Respondent has not made any application to vacate or modify the Award; nor is there any basis for Respondent to do so.

30.     This Petition is timely as it has been filed within one (1) year after the Award was issued.

31.     No prior request has been made for the relief sought herein.

**WHEREFORE**, Petitioner prays that this Court issue an Order:

a. confirming the Award;

b. entering judgment on the Award in favor of Petitioner and against Respondent for $227,725.94, together with interest from the date of the Award;

c. awarding costs and disbursements incurred in bringing this Petition;

d. awarding reasonable attorneys' fees; and

e. granting Petitioner such other and further relief as the Court deems just and proper.

4

Dated: New York, New York
       March 14, 2014

                    SHER TREMONTE LLP


                    By: _____
                           Justin M. Sher
                           Justin J. Gunnell
                    80 Broad Street, Suite 1301
                    New York, New York 10004
                    Tel: 212.202.2600
                    Email: jsher@shertremonte.com
                    Email: jgunnell@shertremonte.com

                    *Attorneys for Petitioner Tube City IMS, LLC*

# EXHIBIT

# A

# Anza Capital Partners

# SALES & PURCHASE CONTRACT

DATE OF ISSUE:  March 9, 2010
CONTRACT NUMBER:  C02252010

This contract is for the sale and purchase of Scrap Metal HMS1&2 and is not to be freely circulated and is only for the purpose of this transaction ("Contract").

This Contract is made and entered into on this March 9, 2010 with terms and conditions by and between following parties, under Incoterms 2000.

## AS THE BUYER:

Company: Tube City IMS, LLC
Address: 12 Mononghela Avenue, Glassport, PA15045 USA

## AS THE SELLER:

Company:            Anza Capital Partners LLC
Address:            333 East 45th Street, Suite 26A, NY, NY 10017 USA
Telephone:          +1.917.763.1338
Fax:                +1.888.546.6193
Email:              joseph.anza@anzacp.com
Represented By:     Joseph V. Anza
Federal Tax ID #:   26-3876277

Whereas the seller with full corporate authority and responsibility certifies, represents, and warrants that it can fulfill the requirements of this agreement and provide product referred to herein in time and for the terms agreed upon thereafter.

Whereas the buyer hereby makes and confirms that they are ready, willing and able to purchase the following described commodity under the terms and conditions as hereunder, subject to execution of the contract for the purchase of the said commodity, upon consideration of the mutual agreement, promise, benefit and terms of this commercial agreement and valuable consideration of the benefit which is hereby acknowledged. The parties do hereby agree and covenant as to honoring the following terms and conditions of this Contract.

Whereas the Seller agrees to sell and Buyer agrees to buy **HMS 1 & 2** ("the Goods") in accordance with the specifications to the present contract. The price given is in United States Dollars, per Metric Ton, as per the International Chamber of Commerce – UCP 600 (ICC 600/2007 revision).

## ARTICLE 01 – QUANTITY

# Anza Capital Partners

1. Quantity:  500 MT (+/- 5% allowed) From San Juan, Puerto Rico
   500MT (+/- 5% Allowed) From Caucedo, Dominican Republic
2. Quantity/Weight of the Commercial Invoice will be based on Certifications of Weight issued by the Port authority

## ARTICLE 02 – PRICE AND CONTRACT VALUE

1. Unit price:      USD $ 375 per MT CFR Kaohsiung, Taiwan
2. Total value:     USD $ 375,000 (+/- 5%)
3. Payment is in United States Dollars
4. Above mentioned price and total value are understood as per Incoterms 2000

## ARTICLE 03 – QUALITY AND SPECIFICATIONS

- Commodity: Heavy melting steel scrap HMS1&2 as per attached photos

    - HMS1 as per ISRI Code No.200-201-202

    - HMS2 as per ISRI Code No.203-204-205-206

- Must be totally free from toxic chemical, radioactive materials, inflammables, explosives, organic matters originated from animals or plants with danger of epidemic diseases and medical waste. Excess molten steel, slugs, steel shavings and trimmings are not acceptable.

- Must be totally free from bullets, bombs, arms, ammunitions, torpedoes, mines, shells, cartridges, seal containers or tanks or envelops, gas cylinders, explosive shells or explosive material in any form.

- Must be free from admixtures such as slag, dross, trash, lubricant, grease, rubber, plastic, oil parts, alloy, asphalt, wood, chemical and other impurities and nonmetals.

- Impurities and non-metals including floor dusts are not more than 0.5% of total weight of each cargo.

## ARTICLE 04 – PACKING AND SHIPMENT

1. Packing:            40FT containers. Each container must contain a minimum of 24.5MT.
2. Term of Delivery:   CFR Kaohsiung, Taiwan (Incoterms 2000)
3. Port of Loading:    San Juan, Puerto Rico and Caucedo, Dominican Republic
4. Port of Discharge:  Kaohsiung, Taiwan
5. Delivery Period:    Delivery to commence within 14 days of receipt of workable L/C and be completed within 30 days of commencement

## ARTICLE 05 – INSPECTION

# Anza Capital Partners

1. Buyer or Buyer Representative is permitted to perform inspection during loading
2. Seller will provide the Buyer by email with at least 6 photos of each container organized as a zip file with container number as file name prior to payment:
   a. 1st photo shows empty container with 2 doors open (with container number clearly visible) taken at the point of loading, before start of loading
   b. 2nd photo shows 25% loaded container (with container number clearly visible)
   c. 3rd photo shows 50% loaded container (with container number clearly visible)
   d. 4th photo shows 75% loaded container (with container number clearly visible)
   e. 5th photo shows fully loaded container with one door open, one door closed showing container number
   f. 6th photos shows container with closed doors with Seal
3. Seller will include a scanned copy of the Weight Slip from the Port in the above-mentioned zip file per container

## ARTICLE 06 – PROCEDURES

1. Signing of Contract by both Buyer and Seller
2. Buyer emails Draft LC
3. Buyer will issue an irrevocable DLC to Seller's bank
4. Shipment Commences
5. Seller will email to Buyer Commercial Invoice, Packing List, Copy of Bill of Lading, Loading Photos, scanned copy of Weight Slip and scanned copy of the Receipt from Port Authority

## ARTICLE 07 – TERMS OF PAYMENT

1. Buyer will issue an irrevocable and confirmable DLC to Seller's bank.
2. All banking charges at the seller's bank are for the seller's account, at the buyer's bank for the buyer's account.

## ARTICLE 08 – DOCUMENTS FOR PAYMENT

1. Full set of 3/3 Original, Clean on Board Bill of lading Marked "Freight Prepaid", setting forth the weight in Metric Tons, evidencing shipment from Loading Port to Discharging Port
2. Seller's manually signed and sealed Commercial Invoice based on net weight issued by the Seller in 03 (three) originals.
3. Packing list showing Contract number, net quantity/weight and gross quantity/weight for each container, total number of containers, container numbers and seal numbers, shipment number in case of partial shipment and name of carrying vessel in 03 (three) originals.

## ARTICLE 09 – BANK DETAILS

### BUYER'S BANK:

# Anza Capital Partners

Bank name:
Address:
Swift Code:
ABA Number:
Account Number:
Account Holder:

**SELLER'S BANK:**

Bank name: JPMorgan Chase, NA
Address: 1 United Nations Plaza  New York, NY 10017 USA
Swift Code: CHASUS33
ABA Number:
Account Number: 000000778073775
Account Holder: Anza Capital Partners LLC

## ARTICLE 10 – CLAIM

In any event of faults of quality and/or weight of goods, the Buyer shall make claim to the Seller within 20 days from the arrival date at discharge port. A survey will be conducted by a Marine Certified 3rd party inspection company who will issue an original certificate of quality, weight/quantity at discharging port which will be submitted to the Seller as evidence. The remittance will be applied, if any.

Quality discrepancy and penalty to be determined between Buyer and Seller.

## ARTICLE 11 – FAILURE/LATE DELIVERY

Should the seller fail to deliver the first shipment owing to causes other than Force Majeure as provided in clause Force Majeure of this contract, the buyer or seller has the right to cancel this contract but buyer may agree to give the seller a grace period of 05 (five) days for delayed shipment.

## ARTICLE 12 – GOVERNING LAW

The contract will be subject to the laws of New York State (Bronx County) in the USA and will be governed, and interpreted in accordance with the rules of the International Chamber of Commerce (ICC) and subject to the interpretation of Incoterms 2000 edition.

## ARTICLE 13 – ARBITRATION

1. The parties hereby agree to settle all disputes amicably. If settlement is not reached, the dispute in question shall be submitted to International Chamber of Commerce in New York.
2. The losing party will pay the arbitration fee. It is understood that in the event of dispute of arbitration, English shall prevail.
3. The award of arbitration shall be final and binding on both parties.

SELLER:                                              BUYER:

# Anza Capital Partners

## ARTICLE 14 – MISCELLANEOUS

1. Upon signing this contract by buyer or seller or authorized representative, all previous negotiations and also all previous correspondence is to be considered null and void.
2. Changes to the terms and conditions of this contract must be in writing and agreed to in writing by all parties involved.
3. This contract shall be legal and binding upon electronic signature of faxed/e-mail copies (PDF format).
4. Carbon copies cannot be used and will not be accepted.
5. Document other than English language are acceptable if also accompanied by proper translation into English language.
6. All supervision and fees or levies at the Port of Loading are for the Seller's account
7. Partial shipment is allowed
8. Transshipment is allowed

## ARTICLE 15 – CONFIDENTIALITY, NON-CIRCUMVENTION AND NON-DISCLOSURE

The Parties accept and agree to the provisions of the International Chamber of Commerce, Geneva, Switzerland for Non-Disclosure and Non-Circumvention with regards to all parties involved in this transaction and Contract, additions, renewals and third party assignments, with full reciprocity for a period of five (5) years from the date of execution of this Contract. Provision includes but is not limited to the Buyer, Seller, Agents, Mandates, Nominees, Assignees and all intermediary parties to this Contract.

## ARTICLE 16 – FORCE MAJEURE

In the event of any strikes, act of God, war, warlike operations, force majeure, lock-out, combination of workmen, interference of trade union, suspension of labor, fire accident, or of any other case whatsoever beyond the control of Seller or Buyer whether of the foregoing nature or not, preventing them or hindering them or either of them from giving or receiving the delivery under this contract shall be suspended during such time provided any such inability by either party contracting hereto Buyer giving notice under this clause, the contract shall be each time extended for a period equal to the period of suspension. But if such period of suspension extends for more than 90 days, the party having received the notice of suspension shall have a right to terminate contract forthwith by giving notice of this to the other party.

## ARTICLE 17 – EQUITY

In entering into this contract, Seller and Buyer recognize that it is impractical to make provision for every contingency that may arise during the life of this contract. Seller and Buyer concur in the principle that this contract shall be carried out between the two parties with fairness and without detriment to the interests of either party, and if in the course of the performance of the contract any infringement of this

# Anza Capital Partners

principle is anticipated or disclosed, then Seller and Buyer shall promptly confer in good faith with each other to agree upon such and action as may be necessary to remove the clause or clause of such infringement.

## ARTICLE 18 – VALIDITY

Upon approvals of parties by signing the contract, the parties agree with all terms and conditions of the contract. The contract comes into effect when both Seller and Buyer sign the Contract. Effective Date of Contract is the last date when either party has signed.  Contract has been issued, signed and sealed on a total of six (6) pages.

### BY SIGNING BELOW THE PARTIES HEREBY ENTER INTO THIS AGREEMENT

**FOR THE BUYER**

Signature / Seal

_____
, Title MANAGING DIRECTOR
Date: March 9, 2010  OF ASIA GROUP

**FOR THE SELLER**
Anza Capital Partners LLC

Signature / Seal

_____
Joseph V. Anza, Managing Partner
Date:  March 9, 2010

# Anza Capital Partners

## APPENDIX A

**1. Bill of Lading:**

Shipper:        **Anza Capital Partners**
                    **333 East 45th Street, Suite 26A**
                    **New York, NY 10017 USA**

Notify:

Consignee:

Marked:          **Freight Prepaid**

Specification:     **Ferrous Scrap Metal**

**2. Invoice to be made to:**

      Buyer:       **Buyer name, address, phone, fax, email**

**3. The original documents should be sent to:**

**BANK NAME:**
**ADDRESS:**
**ACCOUNT NO.:**
**NAME:**
**SWIFT CODE:**
**TEL.:**
**FAX:**

SELLER:                       BUYER: _jmee_

# EXHIBIT

# B



**International Court of Arbitration** ● **Cour internationale d'arbitrage**

# AWARD

**ICC International Court of Arbitration**   ● **Cour internationale d'arbitrage de la CCI**
38 Cours Albert 1er, 75008 Paris, France
Tel +33 (0)1 49 53 28 28  Faxes +33 (0)1 49 53 29 29 / +33 (0)1 49 53 29 33
E-mail arb@iccwbo.org  Website www.iccarbitration.org

# ICC INTERNATIONAL COURT OF ARBITRATION

### CASE No. 18991/VRO/AGF

### TUBE CITY IMS, LLC

(U.S.A.)

**vs/**

### ANZA CAPITAL PARTNERS LLC

(U.S.A.)

This document is an original of the Final Award rendered in conformity with the
Rules of Arbitration of the ICC International Court of Arbitration.

**INTERNATIONAL CHAMBER OF COMMERCE**

**INTERNATIONAL COURT OF ARBITRATION**

**CASE No. 18991/VRO/AGF**

**BETWEEN:**

**TUBE CITY IMS, LLC (U.S.A.)**

**(Claimant)**

-and-

**ANZA CAPITAL PARTNERS LLC (U.S.A.)**

**(Respondent)**

---

**FINAL AWARD**

---

**The Arbitral Tribunal**

Emma Lindsay, Esq.
(Sole Arbitrator)

# TABLE OF CONTENTS

Page

I.      OVERVIEW OF THE CASE .................................................................................1

II.     THE ARBITRAL PROCEEDINGS ........................................................................2

    A.      The Parties and Their Counsel ...................................................................2

        1.      Claimant:  Tube City IMS, LLC .................................................2

        2.      Respondent:  Anza Capital Partners LLC ....................................2

    B.      The Agreement to Arbitrate ........................................................................2

    C.      The Arbitral Tribunal .................................................................................2

    D.      The Terms of Reference..............................................................................3

    E.      Other Matters Concerning the Conduct of the Arbitration ........................3

        1.      Place of the Arbitration ...............................................................3

        2.      Applicable Law .............................................................................3

        3.      Language.......................................................................................3

        4.      Applicable Procedural Rules.........................................................4

    F.      Procedural History .....................................................................................4

III.    SUMMARY OF CLAIMANT'S CASE AND REQUEST FOR RELIEF.....................6

IV.     SUMMARY OF RESPONDENT'S CASE AND REQUEST FOR RELIEF ..............7

V.      ISSUES TO BE DETERMINED ............................................................................8

VI.     THE TRIBUNAL'S ANALYSIS ...........................................................................9

    A.      Was the June 3, 2010 Check from Tube City to Anza an Overpayment? ...............9

        1.      Were Anza's Invoices I001007, I001014 and I001018 Paid by Tube City Prior to June 2010? ........................................................................9

        2.      Was Tube City's Check a Payment in Respect of the Same Invoices? .....12

    B.      Is Tube City Entitled to Recover the Overpayment? .............................................13

        1.      Was There a Mistake of Material Fact?...................................................14

i

        2.     Was Anza's Position Changed? ...............................................................14

        3.     Would It Be Inequitable to Allow Recovery? ..................................15

   C.     Is Tube City Entitled to Punitive Damages for Conversion? ...................17

   D.     Costs ..............................................................................................................21

        1.     Costs of the Arbitration Fixed by the ICC Court ........................22

        2.     Legal and Other Costs ...................................................................22

VII.   THE TRIBUNAL'S AWARD ................................................................................22

## GLOSSARY OF CITATION REFERENCES

| | |
|---|---|
| Sales and Purchase Contract | Sales and Purchase Contract dated March 9, 2010 between Tube City IMS, LLC and Anza Capital Partners LLC |
| RFA | Claimant's Request for Arbitration |
| Answer | Respondent's Answer |
| Cl. Mem. | Claimant's Pre-Hearing Memorial |
| Resp. Mem. | Respondent's Pre-Hearing Memorial |
| Cl. Reply | Claimant's Pre-Hearing Reply Memorial |
| Resp. Reply | Respondent's Pre-Hearing Reply Memorial |
| Cl. PHB | Claimant's Post-Hearing Brief |
| Resp. PHB | Respondent's Post-Hearing Brief |
| Unsigned Anza Stmt. | Witness Statement of Joseph Anza filed on July 1, 2013 |
| Final Anza Stmt. | Witness Statement of Joseph Anza filed on July 3, 2013 |
| Hruska Stmt. | Witness Statement of Anthony Hruska |
| Hruska Reply | Reply Witness Statement of Anthony Hruska |
| Rippel Decl. | Declaration of Colette Rippel |
| Cl. Aff. of Costs | Affirmation of Costs of Jonathan D. Marcus, Esq. |
| Resp. Aff. of Costs | Affirmation of Costs of Michael Levine, Esq. |
| Ex. | Exhibit |
| TOR | Terms of Reference |
| ICC Rules | Rules of Arbitration of the International Chamber of Commerce in force as of January 1, 2012 |

## I. OVERVIEW OF THE CASE

1. By its Request for Arbitration dated October 5, 2012, Claimant Tube City IMS, LLC ("Tube City" or "Claimant") sought arbitration pursuant to the Rules of Arbitration of International Chamber of Commerce ("ICC Rules") of a dispute with Respondent Anza Capital Partners LLC ("Anza" or "Respondent") in connection with a Sales and Purchase Contract dated March 9, 2010 between Tube City and Anza (the "Sales and Purchase Contract").

2. Under the Sales and Purchase Contract, Tube City and Anza agreed that Anza would sell and Tube City would purchase Scrap Metal HMS 1&2 (the "goods") to be shipped from Puerto Rico and the Dominican Republic to Taiwan. Anza made four shipments of goods in fulfillment of the contract. The shipments were reflected on Anza's Invoices I001007, I001014, I001018 and I001019. Tube City's payments to Anza relating to these shipments are at the center of the dispute between the parties.

3. This arbitration was brought by Tube City to recover money allegedly paid to Anza by mistake. Tube City claimed that it inadvertently sent Anza a duplicate payment of $90,703.94 by check dated June 3, 2010 for Anza's Invoices I001007, I001014 and I001018, which Tube City contended that it previously paid by two wire transfers on May 19 and 20, 2010. Tube City requested compensatory and punitive damages for the alleged $90,703.94 overpayment retained by Anza.

4. Anza disputed that the check was an overpayment, claiming that it was applied in part to outstanding invoices reflecting shipments to Tube City under different contracts between the parties and in part to an alleged shortfall in Tube City's payment of Invoice I001019 for the fourth and final shipment made under the Sales and Purchase Contract. Anza further disputed that it received payment from Tube City for Invoices I001014 and I001018 by wire transfer on May 19, 2010. Anza requested that Tube City's claims be denied in all respects.

5. Both parties requested an award of their reasonable attorneys' fees and costs.

6. The central issues before the Tribunal are (a) whether Tube City's check dated June 3, 2010 was an overpayment by Tube City in respect of Anza's Invoices I001007, I001014 and I001018; (b) if there was an overpayment, whether Tube City is entitled to recover it; (c) if Tube City is entitled to recover the overpayment, whether the Tribunal has the power to grant punitive damages as requested by Tube City and, if so, whether an award for punitive damages is appropriate in this case and what is the quantum of such damages; (d) what are the costs and expenses of and incidental to this arbitration and how should such costs be allocated between the parties; and (e) whether legal fees and expenses are recoverable as part of the costs of the arbitration and, if so, how much is owed and to which party.

II.     **THE ARBITRAL PROCEEDINGS**

A.      **The Parties and Their Counsel**

1.      *Claimant:  Tube City IMS, LLC*

7.      Claimant is a limited liability company incorporated in Delaware, U.S.A.  Its principal place of business is located at 12 Monongahela Avenue, Glassport, PA 15045, U.S.A.

8.      Claimant is represented by Jonathan D. Marcus, Esq. of Marcus & Shapira LLP, which is located at One Oxford Centre, 35th Floor, 301 Grant Street, Pittsburgh, PA 15219, U.S.A. (tel: +1 412 471 3490; fax: +1 412 391 2315; email: jmarcus@marcus-shapira.com).

2.      *Respondent:  Anza Capital Partners LLC*

9.      Respondent is a private limited liability company incorporated in New York, U.S.A.  Its principal place of business is located at 333 East 45th Street, Suite 26A, New York, NY 10017, U.S.A.

10.     Respondent is represented by Michael Levine, Esq. of Levine & Associates, P.C., which is located at 15 Barclay Road, Scarsdale, NY 10583, U.S.A. (tel: +1 914 600 4288; fax: +1 914 725 4778; email: ml@levlaw.org).

B.      **The Agreement to Arbitrate**

11.     The parties' agreement to arbitrate is contained in Article 13 of the Sales and Purchase Contract.  It reads as follows:

> 1. The parties hereby agree to settle all disputes amicably.  If settlement is not reached, the dispute in question shall be submitted to International Chamber of Commerce in New York.
> 2. The losing party will pay the arbitration fee.  It is understood that in the event of dispute of arbitration, English shall prevail.
> 3. The award of arbitration shall be final and binding on both parties.

C.      **The Arbitral Tribunal**

12.     The arbitration agreement does not specify the number of arbitrators.  In its Request for Arbitration dated October 5, 2012, Claimant proposed that the dispute be heard by one arbitrator.   In its Answer dated November 14, 2012, Respondent requested that the dispute be heard by three arbitrators.  As the parties did not agree on the number of arbitrators, the International Court of Arbitration of the International Chamber of Commerce (the "ICC Court") decided at its session of November 29, 2012 to submit the dispute to one arbitrator.

13.    By email of December 17, 2012, Claimant nominated Charles Moxley as Sole Arbitrator. By email of December 18, 2012, Respondent objected to Claimant's proposal.  As the parties did not agree on the arbitrator to be appointed, the ICC Court at its session of January 24, 2013 appointed Emma Lindsay as Sole Arbitrator upon proposal of the United Kingdom National Committee following Respondent's request that a non-U.S. national be appointed in accordance with Article 13(3) of the ICC Rules.

14.    The contact details of the Sole Arbitrator are as follows:

> Emma Lindsay, Esq.
> Simpson Thacher & Bartlett LLP
> 425 Lexington Avenue
> New York, NY 10017
> U.S.A.
> Tel:  +1 212 455 3179
> Fax:  +1 212 455 2502
> Email:  elindsay@stblaw.com

### D.    The Terms of Reference

15.    Following appointment of the Tribunal, the Terms of Reference were prepared in accordance with Article 23 of the ICC Rules and signed on behalf of the parties and by the Tribunal on March 13, 2013.

### E.    Other Matters Concerning the Conduct of the Arbitration

#### 1.    *Place of the Arbitration*

16.    The place of the arbitration was New York, New York (U.S.A.), as fixed by the ICC Court at its session of November 29, 2012.

#### 2.    *Applicable Law*

17.    The law applicable to the substance of the matters in dispute is specified in Article 14 of the Sales and Purchase Contract.

18.    Article 14 reads as follows:

> The contract will be subject to the laws of New York State (Bronx County) in the USA and will be governed, and interpreted in accordance with the rules of the International Chamber of Commerce (ICC) and subject to the interpretation of Incoterms 2000 edition.

#### 3.    *Language*

19.    The language of the arbitration is English, as prescribed by Article 13 of the Sales and Purchase Contract.  The proceedings have been conducted in this language.

### 4. *Applicable Procedural Rules*

20. Paragraph 33 of the Terms of Reference states that "[t]he arbitration shall be conducted in accordance with the ICC Rules of Arbitration in force as from January 1, 2012, except as otherwise agreed by the parties and the Arbitral Tribunal. In the absence of provisions therein in respect of a particular procedural issue, the procedure shall be determined by the Arbitral Tribunal (after receiving the views of the parties) so as to effectuate an efficient procedure and substantial justice among the parties."

21. Pursuant to paragraph 34 of the Terms of Reference, the IBA Rules on the Taking of Evidence in International Arbitration adopted on May 29, 2010 (the "IBA Rules") have been used as guidelines to the extent considered appropriate by the Tribunal in the exercise of its overall procedural discretion.

### F. Procedural History

22. On October 5, 2012, Claimant filed a Request for Arbitration pursuant to Article 13 of the Sales and Purchase Contract.

23. On November 14, 2012, Respondent filed an Answer.

24. On November 29, 2012, the ICC Court fixed New York, New York (U.S.A.) as the place of the arbitration and decided to submit the arbitration to one arbitrator.

25. On January 24, 2013, the ICC Court appointed Emma Lindsay as Sole Arbitrator upon proposal of the United Kingdom National Committee.

26. On March 8, 2013, Claimant filed submissions on its proposed procedural timetable.

27. On March 12, 2013, Respondent filed submissions on its proposed procedural timetable.

28. On March 12, 2013, a preliminary case management conference was held among the parties and the Tribunal to determine the procedural timetable.

29. On March 13, 2013, the Terms of Reference were signed.

30. On March 29, 2013, the Tribunal issued Procedural Order No. 1 setting forth the procedural timetable for the conduct of the arbitration.

31. On June 14, 2013, Claimant requested that the Tribunal compel Respondent to produce certain documents.

32. On June 18, 2013, Respondent objected to Claimant's request.

33. On June 19, 2013, Claimant responded to Respondent's objection.

34. On June 20, 2013, the Tribunal issued Procedural Order No. 2 setting out its ruling on document disclosure.

35. On June 24, 2013, Claimant filed the Witness Statement of Anthony Hruska (the "Hruska Statement").

36. On July 1, 2013, Respondent filed the unsigned Witness Statement of Joseph Anza (the "Unsigned Anza Statement") and Respondent's Description of the Nature and Scope of Respondent's Search for Documents Pursuant to Procedural Order No. 1.

37. On July 2, 2013, Claimant moved to strike the Unsigned Anza Statement as late filed and requested that the Tribunal draw an adverse inference from Respondent's failure to produce certain documents.

38. On July 3, 2013, Respondent filed the signed Witness Statement of Joseph Anza, with amendments to the unsigned version filed on July 1, 2013 (the "Final Anza Statement"), and Respondent's Amended Description of the Nature and Scope of Respondent's Search for Documents Pursuant to Procedural Order No. 1.

39. On July 4, 2013, the Tribunal issued procedural directions permitting Claimant to file a reply witness statement responding solely to matters addressed in the Final Anza Statement and confirming that, in accordance with Article 9(1) of the IBA Rules, the Tribunal would determine the admissibility, relevance, materiality and weight of evidence offered by the parties and draw the inferences and conclusions that it deemed appropriate after all evidence was presented.

40. On July 10, 2013 Claimant filed the Reply Witness Statement of Anthony Hruska (the "Hruska Reply").

41. On July 16, 2013, Claimant filed its Pre-Hearing Memorial.

42. On July 17, 2013, Respondent filed its Pre-Hearing Memorial.

43. On July 26, 2013, Claimant filed its Pre-Hearing Reply Memorial and the Declaration of Colette Rippel (the "Rippel Declaration").

44. On July 26, 2013, Respondent filed its Pre-Hearing Reply Memorial.

45. On July 29, 2013, Respondent opposed the filing of the Rippel Declaration as unauthorized and late filed. On July 29, 2013, Claimant responded to Respondent's opposition.

46. On July 30, 2013, Claimant filed additional documents as discovered that day by Ms. Rippel.

47. On July 30, 2013, a pre-hearing conference was held among the parties and the Tribunal.

48. On July 31, 2013, Respondent withdrew its opposition to the filing of the Rippel Declaration.

49. On August 1, 2013, the hearing was held in New York, New York (U.S.A.).

50.  On August 20, 2013, Claimant moved to supplement the evidentiary record with an additional document.

51.  On August 22, 2013, Respondent opposed Claimant's motion.  On August 22, 2013, Claimant responded to Respondent's opposition.  On August 23, Respondent replied to Claimant's response.  On August 23, 2013, Claimant commented on Respondent's reply.

52.  On August 26, 2013, Claimant moved to further supplement the evidentiary record with a second additional document.

53.  On September 2, 2013, the Tribunal issued Procedural Order No. 3 setting out its ruling on Claimant's motion to supplement the evidentiary record.

54.  On September 17, 2013, Claimant filed its Post-Hearing Brief.

55.  On September 18, 2013, Respondent filed its Post-Hearing Brief.

56.  On September 20, 2013, each party filed its Affirmation of Costs.

57.  On October 14, 2013, the Secretariat informed the parties that the Tribunal had been invited to suspend its work due to the non-payment of the advance on costs.

58.  On November 6, 2013, the Secretariat informed the parties that the advance on costs had been paid and invited the Tribunal to proceed with the drafting of the award.

59.  On December 31, 2013, the Tribunal declared the proceedings closed pursuant to Article 27 of the ICC Rules.

60.  In accordance with its usual practice, and pursuant to Article 30(2) of the ICC Rules, the ICC Court extended the time limit within which the Tribunal was required to render its Award.  The last extension was granted by the ICC Court on January 30, 2014 when it extended the time limit to February 28, 2014.

## III.  SUMMARY OF CLAIMANT'S CASE AND REQUEST FOR RELIEF

61.  In summary, Tube City submitted that this is an action for the return of an overpayment arising out of the Sales and Purchase Contract and a related conversion.  It was Tube City's position that in 2010 Tube City made duplicative payments to Anza against the same shipments of scrap metal goods, which shipments were reflected on Anza's Invoices I001007, I001014 and I001018, and Anza subsequently ignored repeated attempts by Tube City to recover its $90,703.94 overpayment.  Tube City submitted that Anza's refusal to return the overpayment constitutes conversion under applicable New York law, for which punitive damages are allowed.  Tube City submitted that Anza should be ordered to return the overpayment and punished for having converted it by an award of punitive damages.

62.    In its Post-Hearing Brief, Claimant stated:

> Tube City is entitled to a return of its overpayment to Anza.  In addition, Anza should be punished for its malicious or reckless disregard for Tube City's right to the overpayment.  Anza's alleged defenses defy logic and, in any event, come far too late. Accordingly, Claimant Tube City respectfully requests that judgment be entered:
>
> (a)    awarding Tube City compensatory damages for the $90,703.94 overpayment unlawfully retained by Anza;
>
> (b)    awarding Tube City punitive damages in an amount sufficient to punish and deter Anza from committing a similarly outrageous act again;
>
> (c)    awarding Tube City its reasonable attorneys' fees and costs;
>
> (d)    granting such other relief as the Tribunal deems just and proper.[1]

## IV.    SUMMARY OF RESPONDENT'S CASE AND REQUEST FOR RELIEF

63.    In summary, Anza submitted that there was no overpayment by Tube City.  It was Anza's position that the majority of Tube City's check for $90,703.94 was applied to prior balances due for shipments by Anza to Tube City that preceded Anza's receipt of the check, which shipments were reflected on Anza's Invoices I001016, I001020 and I001021.  Additionally, Anza submitted that on one occasion after a particular order was placed by Tube City and placed in transit by Anza, the market price for the commodity purchased decreased and Tube City refused to comply with its contractual obligation to take delivery of the purchased goods unless Anza agreed to a reduced price.  Anza claimed that it agreed to the same under economic duress and was therefore entitled to apply the remainder of Tube City's check in respect of this order, which was reflected on Anza's Invoice I001019.  Finally, Anza submitted that neither the Sales and Purchase Contract nor New York law permits an award of punitive damages and this Tribunal is otherwise without jurisdiction to entertain any such claim.

64.    In its Post-Hearing Brief, Respondent stated:

> ACP respectfully requests that (i) the Claimant's claim be denied in all respects, (ii) administrative costs and arbitrator's fee of this proceeding be apportioned 100% to, and borne solely by,

---

[1]    Cl. PHB at 14.

Claimant; and (iii) ACP be awarded its reasonable attorney's fees and costs.[2]

## V. ISSUES TO BE DETERMINED

65. Based on the parties' submissions and the evidence presented, the Tribunal is required to decide the following issues.[3]

   a. Was Tube City's check dated June 3, 2010 in the amount of $90,703.94 an overpayment by Tube City in respect of Anza's Invoices I001007, I001014 and I001018? Specifically, (i) had Anza already received payment from Tube City for these invoices, in particular through a wire transfer of $62,307.67 on May 19, 2010 in respect of Invoices I001014 and I001018, when it received the check;[4] and (ii) was the check accompanied by any document or documents indicating that the payment was made in respect of Invoices I001007, I001014 and I001018?

   b. If there was an overpayment, is Tube City entitled to recover it? In particular, (i) does a delay of several months by Tube City in notifying Anza of the overpayment preclude its recovery; (ii) did Anza properly apply the majority of the funds from Tube City's check to outstanding Invoices I001016, I001020 and I001021 reflecting shipments to Tube City under contracts other than the Sales and Purchase Contract; and (iii) did Anza properly apply the remainder of the funds from Tube City's check to a shortfall in Tube City's payment of Invoice I001019 for the fourth and final shipment made under the Sales and Purchase Contract?

   c. If Tube City is entitled to recover the overpayment, does the Tribunal have the power to grant punitive damages as requested by Tube City and, if so, is an award of punitive damages for conversion appropriate in this case and what is the quantum of such damages?

   d. What are the costs and expenses of and incidental to this arbitration and how should such costs be allocated between the parties?

   e. Whether legal fees and expenses are recoverable as part of the costs of the arbitration and, if so, how much is owed and to which party?

---

[2]    Resp. PHB at 14.

[3]    *See also* TOR ¶¶ 25-26.

[4]    As set forth below, it was common ground between the parties that Anza received payment from Tube City for Invoice I001007 in May 2010.

## VI.    THE TRIBUNAL'S ANALYSIS

### A.    Was the June 3, 2010 Check from Tube City to Anza an Overpayment?

66.    Tube City claims that its check dated June 3, 2010 in the amount of $90,703.94 was an overpayment to Anza for Anza's Invoices I001007, I001014 and I001018.

67.    In order to determine whether Tube City made an overpayment for Invoices I001007, I001014 and I001018, the Tribunal must first determine whether those invoices had been paid by Tube City prior to Anza's receipt of the check.  The Tribunal must then determine whether it should have been clear to Anza when Anza received the check that the check was intended to be applied to the same three invoices.

### *1.    Were Anza's Invoices I001007, I001014 and I001018 Paid by Tube City Prior to June 2010?*

68.    Tube City claimed that its payments to Anza against the first three shipments under the Sales and Purchase Contract were made as follows.[5]

| Anza Invoice No(s). | Invoice date | Invoiced amount | Payment by Tube City | Payment date | Method of Payment |
|---|---|---|---|---|---|
| I001007 | 4/2/2010 | $28,395.97 | $28,395.97 | 5/20/2010 | Wire transfer |
| I001014 I001018 | 4/22/2010 | $62,307.67 | $62,307.67 | 5/19/2010 | Letter of Credit |
| I001007 I001014 I001018 | | | $90,703.94[6] | 6/3/2010 | Check |

69.    It was common ground between the parties that Anza received the payment of $28,395.97 in respect of Invoice I001007.[7]  However, it was not until the hearing that it became clear that Anza disputed having received the payment of $62,307.67 in respect of Invoices I001014 and I001018 when Mr. Anza testified that Anza never received such a payment.[8]

---

[5]    Cl. PHB at 3; Hruska Stmt. Ex. H.

[6]    Tube City's witness Mr. Hruska testified at the hearing that the $0.30 discrepancy between the total amount sought by Invoices I001007, I001014 and I001018 ($90,703.64) and the amount of the check ($90,703.94) was the result of "rounding" by Tube City's accounting system. Cl. PHB at 5 n.7.

[7]    Resp. PHB at 3.

[8]    Procedural Order No. 3 dated Sept. 2, 2013 ¶ 9. *See also* Resp. PHB at 3.  Mr. Anza is the principal of Respondent Anza.  Resp. Mem. at 2.

70.   In the record at the time of the hearing was a "Wire Transfer Entry Review" printout dated May 19, 2010 and claimed by Tube City to reflect the payment of $62,307.67 to Anza.[9]   Anza submitted that the printout shows only that this sum was transferred from one of Tube City's bank accounts to another of its accounts.[10]

71.   Following the hearing but prior to the submission of the parties' Post-Hearing Briefs, Tube City moved to supplement the evidentiary record in order to rebut Anza's claim that it never received the payment.[11]   Arguing that this claim was made for the first time at the hearing and the interests of justice would be best served by allowing Tube City to supplement the record with evidence to rebut it, Tube City sought to add to the record a document entitled "Tube City Debit Notification", which bears the date May 19, 2010 and appears to be from Bank of America (the "May 19 Debit Notification").[12]

72.   Anza opposed the addition to the record of the May 19 Debit Notification on several grounds, including that the document should not be received after the close of the hearing and that the document has no probative value and is inadmissible hearsay.[13]   Anza disputed Tube City's assertion that Anza claimed for the first time at the hearing that it never received the wire transfer payment, arguing that the question of payments allegedly made by Tube City, and applied by Anza, has been at issue since the outset of the arbitration.[14]

73.   Following the parties' submissions to the Tribunal regarding the May 19 Debit Notification, Tube City moved on August 26, 2013 to include in the record pursuant to its pending motion an email chain of the same date between John Potanko and John Malone (the "Potanko/Malone Email Exchange").  The document indicates that these individuals are Tube City's Manager of Global Treasury Operations and Executive Director for Corporate Client Banking at JP Morgan respectively.[15]

---

[9]   TUBE CITY 000437, submitted by Claimant as Hruska Stmt. Ex. H and by Respondent as Resp. PHB Ex. 7.

[10]   Resp. PHB at 3-4.

[11]   Claimant's Motion to Supplement the Evidentiary Record dated August 20, 2013.

[12]   This document was attached as Exhibit A to Claimant's motion.  *See also* Cl. PHB, Ex. A.

[13]   Respondent's Opposition to Claimant's Motion to Submit Additional Evidence After the Close of the Hearing dated August 22, 2013.

[14]   *Id.* at 2.

[15]   This document was attached to Claimant's email to the Tribunal dated August 26, 2013. *See also* Cl. PHB, Ex. B.

74. Anza, in compliance with the Tribunal's direction of August 23, 2013 that no further submissions be made with respect to Tube City's motion, did not address the Potanko/Malone Email Exchange in briefing the motion, but addressed the document in its Post-Hearing Brief as requested by the Tribunal in Procedural Order No. 3, making "a similar argument" to that made in respect of the May 19 Debit Notification.[16]

75. In granting Tube City's motion to supplement the evidentiary record, the Tribunal noted that it was persuaded by Anza's arguments as to the lack of probative value of the May 19 Debit Notification.[17]  That document shows that Bank of America intended to debit one of Tube City's accounts for settlement of certain payments in connection with Letter of Credit No. 64508670, which was the letter of credit issued pursuant to the Sales and Purchase Contract,[18] for draft amounts corresponding to the sums due under Invoices I001014 and I001018.  It does not indicate whether the debits listed were in fact made or whether the settlements pursuant to the letter of credit were completed.

76. Turning next to the Potanko/Malone Email Exchange, that document shows Mr. Malone's confirmation that JP Morgan "received the funds and paid Anza Capital Partners for the lc drawings of $55,285.54 and 7,022.13" in response to an enquiry from Mr. Potanko requesting confirmation of receipt by JP Morgan of $62,307.67 from Tube City's bank, Bank of America, on or around May 19, 2010 "as related to the attached LC."  The document speaks directly to the issue of whether Anza received the disputed payment and evidences that it did.

77. As set forth above, the evidence presented by the parties on the issue of whether Anza received $62,307.67 as payment for its Invoices I001014 and I001018 is limited.  Mr. Anza testified for the first time at the hearing that Anza never received the payment.  The only probative documentary evidence on the issue, the Potanko/Malone Email Exchange, was submitted by Tube City after the hearing.

78. The Tribunal is persuaded by the evidence before it that Anza received a payment of $62,307.67 from Tube City in respect of Anza's Invoices I001014 and I001018 under the letter of credit issued pursuant to the Sales and Purchase Contract.  The Potanko/Malone Email Exchange confirms that Anza received this payment in two drawings under the letter of credit.  Mr. Anza's testimony that Anza never received the payment was given for the first time at the hearing and is at odds with the documentary evidence.

---

[16]   Resp. PHB at 12-13.

[17]   Procedural Order No. 3 ¶ 10 n. 2.

[18]   Hruska Stmt. Ex. H, TUBE CITY 000070-73.

79.   Accordingly, the Tribunal finds that Anza received payment in respect of its Invoices I001007, I001014 and I001018 prior to receiving the June 3, 2010 check from Tube City.[19]

### 2.   Was Tube City's Check a Payment in Respect of the Same Invoices?

80.   In order to determine whether Tube City's June 3, 2010 check was intended to be a payment in respect of Invoices I001007, I001014 and I001018 as Tube City claimed, the Tribunal must next determine whether it should have been clear to Anza when Anza received the check that the check was designated for these three invoices, which, as the Tribunal has found, had already been paid by Tube City.

81.   As there is no reference on the face of the check to a particular invoice, shipment or contract,[20] this question turns on what documents, if any, accompanied the check issued to Anza on June 3, 2010 when it was sent by Tube City to Anza that month.   The Tribunal requested the parties specifically to address this central issue of fact in their Post-Hearing Briefs.[21]

82.   It was Tube City's position that the check was accompanied by a settlement report showing the transactions for which the check was designated, payment of which had already been made.[22]   At the hearing, Tube City's witness Mr. Hruska testified that it was not Tube City's practice either to include a reference on the face of its checks or to enclose a cover letter indicating the transactions to which a check applied; rather, as a matter of general practice every check issued by Tube City in the ordinary course of its business was accompanied by a printed settlement report reflecting the transactions to which the check applied, although Mr. Hruska did not recall whether a settlement report accompanied the check in this particular instance.[23]   A copy of the settlement report that Tube City claimed accompanied the check was provided to the Tribunal.[24]   Tube City submitted that "[t]he dates, amounts paid, and container/vehicle ID numbers on the settlement report which accompanied the overpayment check match perfectly with

---

[19]   As noted above, it was common ground between the parties that Anza received a payment of $28,395.97 in respect of Invoice I001007.

[20]   Hruska Stmt. Ex. H, TUBE CITY 000434.

[21]   Procedural Order No. 3 ¶ 12(a).

[22]   Cl. PHB at 5.

[23]   *Id*. Mr. Hruska was Tube City's Domestic & International Credit Manager between 2000 and 2011.  In that role, he administered and managed the financing, accounting and billing of all of Tube City's international transactions, including the transactions at issue in this case.  Hruska Stmt. ¶ 4.

[24]   Hruska Stmt. Ex. H, TUBE CITY 000435-36.

information listed on three invoices Anza submitted under the first contract [the Sales and Purchase Contract]."[25]

83.   Anza's position was that no documents accompanied Tube City's check for $90,703.94 when it was received by Anza in June 2010.  At the hearing, Mr. Anza testified that no documents of any kind accompanied the check.[26]

84.   The Tribunal notes that very little evidence was put before it on this important issue and limited cross examination on the issue was conducted at the hearing.  Taking into account the evidence before it, the Tribunal finds that the check for $90,703.94 sent by Tube City to Anza was accompanied by a settlement report showing the shipments to which the check applied.  Notwithstanding that Mr. Hruska could not recall this particular instance, he testified that Tube City had a business practice of including documentation with checks indicating the shipments for which payment was intended; the specific documentation that was said to have accompanied the check at issue in this case is before the Tribunal.  Mr. Anza simply stated, without more, that no documentation accompanied the check.  The Tribunal has carefully examined the submissions of the parties and the evidence presented on this issue from as many angles as were raised by the parties and is persuaded that Tube City's general business practice was followed in this instance, particularly given that the check was for a nearly six figure sum.

85.   Accordingly, the Tribunal finds that the check dated June 3, 2010 was an overpayment by Tube City in respect of Anza's Invoices I001007, I001014 and I001018.  Anza received together with the check a settlement report indicating that the check was issued in connection with shipments for which payment had already been made by Tube City.

## B.   Is Tube City Entitled to Recover the Overpayment?

86.   New York law permits the recovery of money paid under a mistake of a material fact, although there was negligence on the part of the person making the payment, unless the position of the party receiving it has been changed in consequence of the payment, and it would be inequitable to allow a recovery.[27]

87.   In determining whether Tube City is entitled to recover the overpayment, the Tribunal considers each of these elements in turn.

---

[25]   Cl. PHB at 5 n.7.

[26]   Resp. PHB at 11.

[27]   *Mayer v. The Mayor*, 63 N.Y. 455, 457 (N.Y. 1875), relied upon by Tube City.  *See* Cl. Mem. at 2; Cl. PHB at 9.

### 1.   Was There a Mistake of Material Fact?

88.   Tube City claimed that the check was issued to Anza inadvertently and mistakenly.[28] Tube City's witness Mr. Hruska testified at the hearing that the overpayment occurred because of human error.[29]

89.   Anza disputed that Tube City inadvertently overpaid Anza. Following cross examination of Mr. Hruska, Anza submitted that it is inconceivable that Tube City's accounts payable department was not aware of the earlier payments in respect of Invoices I001007, I001014 and I001018 when it issued the check given that the earlier payments would have been entered in the department's computer records.[30]

90.   The Tribunal accepts Mr. Hruska's testimony that the overpayment occurred because of human error and finds that the overpayment to Anza was based on a mistake of fact, namely the amount actually owed by Tube City to Anza for Invoices I001007, I001014 and I001018 as of June 3, 2010. This fact is at the center of the case and is undoubtedly material. That Mr. Hruska was unable to provide an explanation of how the same invoices were paid twice by the same department is consistent with a mistake having been made. That Tube City's issuance of the check constituting the overpayment may have been negligent does not bar recovery.[31]

### 2.   Was Anza's Position Changed?

91.   It was common ground between the parties that Anza's position was changed as a consequence of receiving the check from Tube City. Anza submitted that the overpayment had already been used for Anza's business purposes when Tube City sought its return and therefore Anza's position had changed.[32] Tube City did not dispute that there was a change in Anza's position due to the overpayment.[33]

---

[28]   Cl. Mem. at 2.

[29]   Cl. PHB at 5.

[30]   Resp. PHB at 7 n.5.

[31]   *Chiofalo v. Ridgewood Savings Bank*, 11 Misc.3d 899, 907 (Civ. Ct. Queens Co. 2006), relied upon by Anza. *See* Resp. Reply at 2.

[32]   Resp. Reply at 4-5.

[33]   Cl. PHB at 12. Rather, Tube City argued that Anza's position had not so changed as to make repayment inequitable. *Id.* The Tribunal considers this argument below.

92.     The Tribunal finds that Anza's position was changed as a consequence of receiving the check. Such a change in position will not bar recovery unless recovery also would be inequitable.[34]

### 3.     Would It Be Inequitable to Allow Recovery?

93.     Anza argued that it would be inequitable to permit Tube City to recover the overpayment on three grounds. First, Anza claimed a delay by Tube City in notifying it of the overpayment, arguing that Tube City did so for the first time in January 2011, some seven months after Tube City tendered its check to Anza and Anza applied the funds to invoices alleged by Anza to have been outstanding at that time.[35] Second, Anza claimed that the funds were properly applied to Anza's open Invoices I001016, I001020 and I001021.[36] Finally, Anza claimed that the remaining funds from the check were properly applied as a partial payment against Anza's Invoice I001019.[37] The Tribunal will consider each of these claims in turn.

94.     Anza submitted that it was first advised by Tube City that Tube City was claiming to have made an overpayment by letter to Mr. Anza from Jamie Miller, Tube City's North American Credit and Accounts Payable Manager.[38] On cross examination, Anza's counsel questioned Tube City's witnesses about the account reconciliation that was allegedly performed by Tube City and prompted the letter. Both Mr. Hruska and Ms. Rippel testified that they were not personally involved in the account reconciliation.[39]

95.     Tube City claimed that its notification of the overpayment to Anza was timely.[40] Mr. Hruska testified at the hearing that Ms. Miller was out of the office on maternity leave from Spring 2010 through September 2010 and that although she was absent at the time of the overpayment, she discovered it quickly upon her return in October 2010. Tube City pointed to Ms. Miller's letter which states that Ms. Miller left several messages to discuss repayment with no return call. Mr. Hruska also testified that he discussed the overpayment in late 2010 with his counterpart at Anza, Fabian Olsson.

---

[34]    *Mayer*, 63 N.Y. at 457.

[35]    Resp. PHB at 7-9.

[36]    *Id.* at 4-6.

[37]    *Id.* at 9-10.

[38]    *Id.* at 8 n.8.

[39]    *Id.* at 7 & n.6. Ms. Rippel is Tube City's Senior Business Manager, a position she has held since 2007. In that position, she is responsible for executing Tube City's international trading business. Rippel Decl. ¶ 1.

[40]    Cl. PHB at 5-6.

96.  The Tribunal first considers the documentary evidence on this issue.  The first written communication from Tube City to Anza regarding the overpayment provided to the Tribunal is the letter to Mr. Anza from Ms. Miller dated January 20, 2011, more than seven months after the check was issued.[41]  The letter refers to Ms. Miller having left several messages to discuss repayment, which messages must have predated the letter. However, Tube City did not call Ms. Miller as a witness and it is unknown to the Tribunal when, if at all, these messages might have been left.  Moreover, Mr. Anza testified at the hearing that he did not receive any such messages from Ms. Miller.  The Tribunal notes that Mr. Hruska testified at the hearing that he discussed the overpayment with Anza's Mr. Olsson in late 2010 and Mr. Anza testified that he was not aware of such a conversation.  Accordingly, the Tribunal accepts that the first notification to Anza by Tube City regarding the overpayment occurred on or around January 20, 2011.

97.  In considering the time it took for Tube City to notify Anza of the overpayment, the Tribunal recalls its earlier finding that a settlement report indicating the transactions to which the check applied—for which Tube City had already paid—accompanied the check when it was sent to Anza in June 2010.  Therefore, although it appears that Ms. Miller's being on leave caused some delay in the overpayment being formally notified to Anza, it should have been apparent to Anza upon receipt of the check that Tube City had made an overpayment.  The Tribunal finds that in such circumstances a delay of several months by Tube City in notifying Anza of the overpayment is not so long as to render it inequitable to permit recovery of the overpayment.

98.  The Tribunal now turns to Anza's arguments with respect to the alleged open invoices to which Anza claimed that it applied the check (its Invoices I001016, I001020 and I001021) and the alleged delinquency in respect of its Invoice I001019 to which Anza claimed the check was also applied.   Given that the Tribunal has found that documentation was included with the check showing the transactions to which the check was to be applied, Anza was not at liberty to apply the funds to transactions other than those indicated on the settlement report (namely, the transactions shown on Invoices I001007, I001014 and I001018).   Consequently, the Tribunal need not address the validity of Anza's Invoices I001016, I001020 and I001021, which was disputed by Tube City, or whether there was a shortfall in Tube City's payment of Invoice I001019, which Tube City also disputed.  Even if the Tribunal were to agree with Anza that sums were outstanding in respect of these four invoices, this would not render it inequitable to allow recovery of the overpayment in circumstances where it should have been clear to Anza from the settlement report that accompanied the check that the check was intended to be applied to different invoices.

99.  Accordingly, the Tribunal finds that Tube City is entitled to recover from Anza its overpayment of $90,703.94.

---

41    Hruska Stmt. Ex. D, TUBE CITY 000433.

**C.     Is Tube City Entitled to Punitive Damages for Conversion?**

100.    Tube City sought punitive damages for Anza's alleged conversion of its overpayment to Anza in respect of Invoices I001007, I001014 and I001018.  Anza claimed that there has been no conversion and Tube City is not entitled to punitive damages.  Anza further claimed that the Tribunal does not have the power to award punitive damages.

101.    The Tribunal first considers Anza's challenge to its authority to award punitive damages.

102.    Anza argued that "the contract between the parties (which provides for arbitration) does not permit any award of 'punitive damages' or grant the tribunal the power to award such exemplary damages."[42]  It was Tube City's position that "[j]ust because the contract does not expressly contemplate punitive damages is of no consequence, as the contract does not expressly allow compensatory damages either."[43]  Tube City pointed to the parties' choice of New York law in their contract and cited New York case law for the proposition that punitive damages are proper in a conversion action.[44]  Neither party offered legal authority in support of its position with respect to the authority of arbitrators, as opposed to courts, to award punitive damages.

103.    In *Mastrobuono v. Shearson Lehman Hutton, Inc.*, the U.S. Supreme Court resolved doubts as to the authority of arbitrators to award punitive damages in favor of the arbitrability of punitive damages claims.[45]  The parties' contract in that case contained an arbitration clause providing for arbitration pursuant to the rules of the National Association of Securities Dealers (the "NASD") and a choice-of-law clause selecting New York law.  Neither clause made mention of punitive damages.  In determining whether a claim of punitive damages was arbitrable under the parties' contract, the Supreme Court held that the Federal Arbitration Act (the "FAA") preempted New York's state law public policy forbidding the arbitrability of punitive damages claims articulated by the New York Court of Appeals in *Garrity v. Lyle Stuart, Inc.*[46]  The Court treated New York's *Garrity* rule as an instance of a state law refusal to give effect to an agreement to arbitrate (specifically, an agreement to arbitrate punitive damages claims), which was preempted by the FAA's requirement that arbitration agreements be recognized and enforced in accordance with their terms.[47]  In finding the punitive

---

[42]    Resp. Reply at 2.

[43]    Cl. PHB at 13.

[44]    *Id.*

[45]    514 U.S. 52 (U.S. 1995).

[46]    353 N.E.2d 793 (N.Y. 1976).

[47]    *Mastrobuono*, 514 U.S. at 58.  The Supreme Court also held that the parties' New York choice-of-law agreement did not have the effect of incorporating New York's public policy against the arbitrability of punitive damages claims into the parties' arbitration agreement.  *Id.* at 61, 68-69.

damages claim arbitrable, the Court relied on the parties' agreement to arbitrate under the NASD Code, which provided generally that arbitrators could award damages and other relief.[48]

104.  As in *Mastrobuono*, the FAA applies to the arbitration agreement at issue in this dispute. The FAA governs arbitration agreements in contracts that involve interstate commerce within the meaning of the statute.[49]   Concluded between a Delaware limited liability company and a New York limited liability company, the Sales and Purchase Contract provides for the sale and purchase of scrap metal to be transported from Puerto Rico and the Dominican Republic to Taiwan. As such, it involves interstate commerce.

105.  Although the Tribunal is not aware of any decisions by U.S. courts addressing the arbitrability of punitive damages claims under arbitration agreements incorporating the ICC Rules, it considers the holding in *Mastrobuono* equally applicable here. Article 13 of the Sales and Purchase Contract makes no mention of punitive damages and provides for the ICC Rules to govern arbitration.  The ICC Rules include broad, unqualified references to relief similar to those in the NASD Code.[50]  Accordingly, following the reasoning in *Mastrobuono*, the Tribunal reads the arbitration agreement between Tube City and Anza as permitting an award of punitive damages based on the parties' selection of the ICC Rules.[51]

106.  Given that the Tribunal has the power to award punitive damages under the parties' arbitration agreement, I turn next to the question of whether punitive damages are available in this case. Tube City claimed punitive damages in respect of an alleged conversion by Anza and submitted that punitive damages may be awarded in an action for conversion under New York law.[52]  Anza did not dispute that such damages may be available for conversion; rather, it took the position that no cause of action for conversion lies here.[53]

---

[48]   *Mastrobuono*, 514 U.S. at 61, 68-69.

[49]   9 U.S.C. §1.

[50]   *See, e.g.*, ICC Rules, Arts. 23, 31.

[51]   This is so notwithstanding the parties' New York choice-of-law clause, which should be read "to encompass substantive principles that New York courts would apply, but not to include special rules limiting the authority of arbitrators" such as the rule in *Garrity*. *Mastrobuono*, 514 U.S. at 64.

[52]   Cl. PHB at 13.

[53]   Resp. Reply at 2-3.

107. The Tribunal finds that under New York law punitive damages are available for conversion.[54] I must now consider whether there has been a conversion as Tube City contended.

108. The elements of conversion as articulated by the New York Court of Appeals are "(1) plaintiff's possessory right or interest in the property . . . and (2) defendant's dominion over the property or interference with it, in derogation of plaintiff's rights."[55]

109. In applying these elements to the case at hand, the Tribunal finds instructive the decision of the U.S. District Court for the Southern District of New York in *Vanderbilt University v. Dipsters Corporation*.[56] In that case, the undisputed facts were as follows.[57] The University placed a purchase order with Dipsters for five pieces of athletic equipment. The actual purchase price for these items came to a total of $109.20. However, the University purchase order mistakenly stated that the total purchase price was $69,521.20. Dipsters' invoice accompanying its delivery of the equipment also reflected that incorrect price. The University paid $69,521.20 to Dipsters by check. A University employee later contacted Dipsters' president to call the overpayment to his attention. Dipsters' president agreed that an overpayment had been made and issued a credit memo to the University for the amount of the overpayment. However, no repayment of any part of that amount was made by Dipsters.

110. On these facts, the Court found that Dipsters had converted the funds, holding that "it is well-settled that an action will lie under New York law for conversion where there is an obligation to return or otherwise treat in a particular manner the specific money in question, . . . , and that money is 'specifically identifiable.'"[58]

111. Anza, having received a settlement report with Tube City's June 3, 2010 check indicating the transactions to which the check was to be applied, was therefore required to apply the money to those transactions (which it could not do as payment for them had already been received) or to return the money. Anza did not return the money.

---

[54] *In re Sattler's, Inc.*, 73 B.R. 780, 792 (Bankr. S.D.N.Y. 1978), relied upon by Tube City. *See* Cl. Mem. at 5; Cl. PHB at 13.

[55] *Colavito v. New York Organ Donor Network, Inc.*, 8 N.Y.3d 43, 50 (N.Y. 2006), cited in *House of Diamonds v. Borgioni, LLC*, 737 F.Supp.2d 162, 167 (S.D.N.Y. 2010), relied upon by Tube City. *See* Cl. Mem. at 4.

[56] 1986 WL 10471 (S.D.N.Y. Sept. 17, 1986), relied upon by Tube City. *See* Cl. Mem. at 5; Cl. PHB at 12.

[57] As stated in the opinion, *Vanderbilt University*, 1986 WL 10471 at *1, the facts are recounted in an earlier opinion in the same case. *See Vanderbilt University v. Dipsters Corporation*, 1985 WL 9366, *1 (S.D.N.Y. July 2, 1985).

[58] *Vanderbilt University*, 1986 WL 10471 at *3.

112.  Anza submitted that Tube City's conversion claim may not succeed because Tube City failed specifically to identify any converted property.[59]  Tube City took the position that the check was specifically identified.[60]  The Tribunal rejects Anza's submission that there was no taking of specific property.  Under New York law, funds paid by check are specifically identifiable and may be the subject of a conversion claim.[61]

113.  Anza further submitted that the failure to repay the funds was simply a breach of contract by Anza and that a cause of action for conversion cannot be predicated on a mere breach of contract.[62]  Tube City took the position that the overpayment was extra-contractual, as by the time that Anza received Tube City's check Anza's shipments and Tube City's payments under the Sales and Purchase Contract were already complete.[63]  The Tribunal finds that Anza's retention of the overpayment was not a breach of contract because payment for the transactions listed on Invoices I001007, I001014 and I001018, for which the settlement report accompanying the check designated the funds, had already been made when the check was received by Anza.

114.  The Tribunal therefore finds that Anza converted the check by failing to return the funds when it was unable to apply the funds to the transactions for which they were designated, as payment for those transactions had already been made.

115.  Punitive damages may be recovered for conversion where "the conversion was accomplished with malice or reckless disregard of plaintiffs' rights."[64]  The remedy is discretionary, as acknowledged by Tube City.[65]

116.  Tube City claimed that punitive damages should be awarded because Anza acted in reckless disregard of Tube City's rights to the overpayment.[66]  Anza claimed that the

---

[59]  Resp. Reply at 3.

[60]  Cl. PHB at 12-13.

[61]  *Vanderbilt University*, 1986 WL 10471 at *3.

[62]  Resp. Reply at 3.

[63]  Cl. PHB at 13.

[64]  *In re Sattler's, Inc.*, 73 B.R. at 792.

[65]  Cl. Mem. at 5; Cl PHB at 13.  *See also Tolbert v. Queens College*, 242 F.3d 58, 77 (2d Cir.2001) ("An award of punitive damages is 'a discretionary moral judgment' that the defendant has engaged in conduct that is so reprehensible that it warrants punishment.").

[66]  Cl. PHB at 13.

funds from the check were properly applied to Anza's open Invoices I001016, I001020 and I001021 and as a partial payment against Anza's Invoice I001019.[67]

117.    The Tribunal declines to exercise its discretion to award punitive damages in this case. Although the Tribunal has found against Anza, Anza's position throughout this arbitration was that it believed it had a right to the overpayment. In such circumstances, Anza's exercise of dominion over the overpayment did not amount to malice or reckless disregard of Tube City's rights.

118.    Having concluded that an award of punitive damages is not appropriate in this case, the Tribunal does not address the quantum of such damages.

### D.    Costs

119.    The parties' arbitration agreement provides that "[t]he losing party shall pay the arbitration fee."[68]    It falls to the Tribunal to determine what costs constitute the "arbitration fee," as this term is not defined in the Sales and Purchase Agreement.

120.    Neither party made submissions on how the term "arbitration fee" should be interpreted. Tube City requested an award of "its reasonable attorneys' fees and costs."[69]    Anza requested that "the administrative costs and arbitrator's fee of this proceeding be apportioned 100% to, and borne solely by, Claimant; . . . and ACP be awarded its reasonable attorney's fees and costs."[70]

121.    For guidance on interpreting the term "arbitration fee," the Tribunal looks to the ICC Rules, which the parties chose to govern arbitration under their agreement.[71]

122.    Article 37(1) of the ICC Rules defines the "costs of the arbitration" as including "the fees and expenses of the arbitrators and the ICC administrative expenses fixed by the Court" as well as "the reasonable legal expenses and other costs incurred by the parties to the arbitration."

123.    In light of the parties' selection of the ICC Rules in their arbitration agreement, the Tribunal interprets "arbitration fee" in Article 13(2) of the Sales and Purchase Contract and "costs of the arbitration" in Article 37(1) to be coextensive. The "arbitration fee" includes the costs of the arbitration fixed by the ICC Court and the reasonable legal and other costs incurred by the parties.

---

[67]    Resp. PHB at 4-6, 9-10.

[68]    Sales and Purchase Contract, Art. 13(2).

[69]    Cl. PHB at 14.

[70]    Resp. PHB at 14.

[71]    Sales and Purchase Contract, Art. 13(1).

124. The parties' specific agreement with respect to costs in Article 13(2)—namely, that they shall be paid by the losing party—overrides the Tribunal's power under the ICC Rules to apportion costs as between the parties.[72]  Tube City has prevailed on its main claim for return of the overpayment.  Anza is therefore the losing party.

125. As required by Article 37(4) of the ICC Rules, the Tribunal proceeds to fix the costs of the arbitration.

### 1.    Costs of the Arbitration Fixed by the ICC Court

126. The Court, at its session of January 30, 2014, fixed the administrative expenses and the arbitrator's fees at $49,402.00.   The arbitration expenses for this case are $598.00. Hence, the total costs of the arbitration fixed by the ICC Court are $50,000.00.

127. This amount is covered by the advance on costs, which was paid in its entirety by Tube City.

128. Accordingly, Anza, as the losing party, is ordered to pay to Tube City $50,000.00 comprising the total arbitrator fees and expenses and ICC administrative expenses.

### 2.    Legal and Other Costs

129. The Tribunal now addresses the reasonable legal and other costs incurred by the parties.

130. Tube City's legal and other costs total $87,022.00.[73]  Anza's legal and other costs total $62,867.22.[74]

131. The Tribunal does not find the parties' legal and other costs to be unreasonable.  Neither party has suggested that the other's claimed costs are in any way erroneous or excessive. The mere fact that Tube City's costs were greater than Anza's does not render Tube City's costs unreasonable.

132. Accordingly, Anza, as the losing party, is ordered to pay Tube City's reasonable legal and other costs totaling $87,022.00.

## VII.   THE TRIBUNAL'S AWARD

133. For all of the reasons set forth above, and rejecting all submissions to the contrary, the Tribunal finds, declares and awards as follows.

   a.    The check dated June 3, 2010 issued by Claimant to Respondent in the amount of $90,703.94 was an overpayment by Claimant in respect of Respondent's Invoices

---

[72]    ICC Rules, Art. 37(4).

[73]    Cl. Aff. of Costs ¶ 3.

[74]    Resp. Aff. of Costs ¶ 2.

I001007, I001014 and I001018, which had already been paid by Claimant when Respondent received the check.

b.      Respondent shall pay to Claimant forthwith upon notification of this award the sum of $90,703.94, being the quantum of the overpayment that Respondent must reimburse to Claimant.

c.      Although the Tribunal finds that Respondent converted the overpayment, the Tribunal declines to exercise its discretion to grant punitive damages in this case.

d.      As required by the parties' arbitration agreement, the costs of the arbitration shall be borne by Respondent as the losing party.

e.      Respondent shall pay to Claimant forthwith upon notification of this award the sum of $137,022.00, being:

  i.      The costs of the arbitration fixed by the ICC Court in the sum of $50,000.00; and

  ii.     Claimant's reasonable legal and other costs in the sum of $87,022.00.

f.      Any and all other claims made in this arbitration are dismissed.


Place of arbitration:  New York, New York (U.S.A.)
Date: February 19, 2014



Emma Lindsay, Esq.
(Sole Arbitrator)


23