UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 10/6/2016
```

-----------------------------------------------------------------------X
:
TUBE CITY IMS, LLC,
:
:
                                   Petitioner,          :          14 Civ. 1783 (PAE)
                    -v-                                  :
                                                        :          OPINION & ORDER
ANZA CAPITAL PARTNERS, LLC,                              :
:
                                   Respondent.          :
:
----------------------------------------------------------------------- X

PAUL A. ENGELMAYER, District Judge:

This decision resolves a creditor's turnover motion. On March 14, 2014, petitioner Tube

City IMS, LLC ("Tube City") commenced this action, seeking under Section 9 of the Federal

Arbitration Act ("FAA"), 9 U.S.C. § 9, confirmation of a February 19, 2014 arbitration award

("Award") issued against respondent Anza Capital Partners, LLC ("Anza LLC"). Dkt. 2

("Petition"). Anza LLC was served with, but did not respond to, the petition. *See* Dkts. 3, 6. On

June 11, 2014, the Court confirmed the Award and entered judgment in favor of Tube City in the

amount of $227,725.94 (the "Judgment"). Dkt. 6.

On May 11, 2016, the Court, pursuant to CPLR § 6201, issued an *ex parte* order of

attachment, Dkt. 21 (the "Attachment Order"), levying funds of a number of recipients of

allegedly fraudulent transfers from Anza LLC. These recipients (collectively, the "Transferees")

included Anza LLC's principal, Joseph V. Anza ("Anza"); his wife, Alexandra Anza; JVA

Partners Ltd., a family trust; and Omni Steel Supply LLC ("Omni"), a business co-owned by

Anza. On June 10, 2016, Tube City filed the pending motion to confirm the attachments, Dkt. 22

(the "Confirmation Motion"), and on June 13, 2016, Tube City filed the pending motion for

turnover of the attached and allegedly fraudulently conveyed funds, Dkt. 26 (the "Turnover Motion").

For the reasons that follow, the Court now grants the Turnover Motion, finding the conveyances at issue fraudulent, and the Confirmation Motion, finding the attachments at issue proper. The Court, however, solicits input from the parties tabulating post-judgment interest and attorneys' fees, so as to assure that the funds attached and turned over to Tube City do not together exceed the amount necessary to make Tube City whole. Pending resolution of that issue, the Court stays the effect of its turnover ruling.

## I.    Background[1]

### A.    The Underlying Dispute

On March 9, 2010, Tube City and Anza LLC agreed to enter into a contract for the sale and purchase of certain scrap metal goods. Petition, Ex. A (the "Agreement"). Under the Agreement, Tube City bought the goods from Anza LLC, who then shipped them to Taiwan from Puerto Rico and the Dominican Republic. Petition ¶ 12. In April 2010, Anza LLC provided Tube City with three sales invoices, totaling $90,703.94. *Id.* ¶ 13. In May 2010, Tube City paid Anza LLC $90,703.94. *Id.* ¶ 14. In June 2010, Tube City inadvertently paid Anza LLC another $90,703.94. *Id.* ¶ 15. Tube City attempted to recover the duplicate payment from Anza LLC, but was unsuccessful — Anza LLC refused to return the money. *Id.* ¶ 16.

### B.    The Arbitration

The Agreement contains an arbitration provision, providing that any unresolved dispute between the parties "shall be submitted to the International Chamber of Commerce in New York" and resolved under New York law. Agreement at 4. The Agreement further provides that

---

[1] The facts are drawn primarily from Tube City's petition to confirm the Award and the attached exhibits, Dkt. 2, and from the sworn declaration of Justin J. Gunnell ("Gunnell Decl.), Dkt. 28.

the "losing party will pay the arbitration fee," and that the "award of arbitration shall be final and binding on both parties." *Id.*

On October 5, 2012, Tube City initiated an arbitration against Anza LLC, seeking to recover the value of the duplicate payment. On August 1, 2013, an arbitration was held in New York City, before a single arbitrator, Emma Lindsay, Esq., of the law firm Simpson Thacher & Bartlett LLP. Petition ¶¶ 20–21. On February 19, 2014, the arbitrator issued the Award, totaling $227,725.94, in favor of Tube City. Dkt. 6. This sum represented reimbursement to Tube City for the overpayment of $90,703.94, fixed arbitration costs of $50,000, and "reasonable legal and other costs" of $87,022.00. Award at 22–35.

### C.      Prior Proceedings Before This Court

On March 14, 2014, Tube City filed a petition to confirm the Award. Dkt. 2. On June 11, 2014, the Court granted that unopposed petition and entered judgment of $227,725.94 for Tube City. Dkt. 6. Anza LLC did not pay the Award.

On November 6, 2014, Tube City moved for various forms of relief in order to enable it to collect on the judgment. These included authorizing various discovery steps aimed at finding reachable assets. Dkt. 8. In a decision issued on November 14, 2014, the Court granted that relief. Dkt. 11. Discovery followed. Tube City subpoenaed of bank records of Anza LLC, Anza, and various affiliates and deposed Anza and his attorney in the underlying arbitration. As developed below, this evidence revealed that, after Tube City initiated the arbitration, Anza had caused Anza LLC to make a series of conveyances to or for the apparent benefit of Anza, his wife, and entities affiliated with him, without fair consideration to Anza LLC for these conveyances.

### D.      The Attachment Order and the Pending Motions

On May 11, 2016, the Court, based on an *ex parte* submission by Tube City detailing evidence that it had found, issued the Attachment Order. Dkt. 21.  The Court found adequate grounds for attaching of various assets of the Transferees under CPLR § 6201, on the grounds that they had received fraudulent transfers from Anza LLC.  The Attachment Order levied money of Anza and the other Transferees held at JP Morgan Chase Bank, N.A., in Manhattan. Dkt. 21.  Specifically, the Court ordered the attachment of $213,062.72 of Anza's funds, $2,000 of Alexandra Anza's funds, $100,000 of Omni's funds, and $66,847.50 of JVA Partners's funds, for a total of $381,910.22.  *Id.*  On June 10, 2016, after the attachments were successfully effected, the Attachment Order was publicly filed.  Dkt. 24, Ex. 9.

On June 10, 2016, Tube City filed the Confirmation Motion, which sought to confirm the Attachment Order, Dkt. 22, and a memorandum of law in support, Dkt. 23 ("Pet. Conf. Br."). On June 13, 2016, Tube City filed the Turnover Motion, which sought an order directing the turnover to Tube City of the Transferees' attached funds to the extent of the fraudulent conveyances, Dkt. 26, and a memorandum of law in support, Dkt. 27 ("Pet. Turn. Br.").  On July 9, 2016, Anza filed an affidavit, dated June 8, 2016, opposing the Confirmation Motion.  Dkt. 33 ("Anza Aff.").  On July 11, 2016, Anza LLC and the Transferees filed a memorandum of law opposing both the Confirmation and Turnover Motions.  Dkt. 34 ("Resp. Br.").  On July 22, 2016, Tube City filed a reply memorandum of law supporting both motions.  Dkt. 39 ("Pet. Reply Br.").

## II.      Applicable Legal Standards

### A.      Standards Governing a Special Proceeding

Under Federal Rule of Civil Procedure 69, Tube City's Confirmation and Turnover motions can be decided in a "special proceeding" under New York Debtor and Creditor Law,

CPLR § 5225(b), and do not require the filing of a plenary action.[2]  Under New York law, a special proceeding is governed by the same standards as govern a motion for summary judgment. *Gonzalez v. City of New York*, 127 A.D.3d 632, 633, 8 N.Y.S.3d 290 (N.Y. App. Div. 2015); *Karr v. Black*, 55 A.D.3d 82, 86 (1st Dep't 2008), *lv denied* 11 NY.3d 712 (2008).  The Court must therefore "decide the matter upon the pleadings, papers and admissions to the extent that no triable issues of fact are raised."  *Gonzalez*, 127 A.D.3d at 633 (internal quotations omitted).

To give rise to a triable issue of fact, a party must come forward with legally cognizable evidence:  As the Second Circuit has explained, a party cannot create an "issue of triable fact" merely by "submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony."  *Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996); *see also Moll v. Telesector Res. Grp., Inc.*, 760 F.3d 198, 205 (2d Cir. 2014) ("The 'sham issue of fact' doctrine prohibits a party from defeating summary judgment simply by submitting an affidavit that contradicts the party's previous sworn testimony.") (internal quotation marks and citation omitted) (emphasis omitted); *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001) ("[F]actual allegations that might otherwise defeat a motion for summary judgment will not be permitted to do so when they are made for the first time in the plaintiff's affidavit opposing summary judgment and that affidavit contradicts [plaintiff's] own prior deposition testimony.").  A factual dispute "created solely by an affidavit crafted to oppose a summary judgment motion" does not constitute a genuine issue for trial and will not defeat a motion for summary judgment supported by competent evidence.

---

[2] The parties agree on this. *See* Pet. Turn. Br. at 10–11; Resp. Br. at 4–5 ("There is no dispute that CPLR § 5225(b) authorizes a special proceeding to be commenced (or, in the case of the federal courts, a Rule 69 motion to be made) against a person who is a transferee of money from a debtor where a judgment creditor's claim of superior rights to those funds arises from a violation of New York's Debtor and Creditor law.") (internal citation omitted).

*Hayes*, 84 F.3d, at 619. Otherwise, "a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony," which would "greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." *Id.* (internal quotation omitted).

Relatedly, a party cannot create a triable issue of fact, and thus avoid summary judgment, by renouncing deposition testimony to the effect that he could not remember a particular fact which he now purports to remember. *See Raskin v. Wyatt Co.*, 125 F.3d 55, 63 (2d Cir. 1997); *see also Kennedy v. City of New York*, 570 F. App'x 83, 84–85 (2d Cir. 2014) (applying the *Hayes* principle to "affirm a grant of summary judgment against a party who testified in his deposition that he was unable to remember a particular fact, and then, in response to a summary judgment motion, submitted an affidavit claiming a recollection of events that would have raised an issue for trial.").

**B.      Standards Governing a Turnover Motion**

Under New York law, "where it is shown that the judgment debtor is in possession or custody of money or other personal property in which he has an interest, the court shall order that the judgment debtor pay the money, or . . . deliver any other personal property . . . to a designated sheriff." C.P.L.R. § 5225(a). New York law similarly provides for the turnover of money or property held by another person in which the judgment debtor has an interest, C.P.L.R. § 5225(b), and for the turnover of debts owed to the judgment debtor by another person, C.P.L.R. § 5227.

Relevant here, the law also provides for turnover to a creditor of money or property held by a third party which a debtor had fraudulently conveyed to that party. Under Debtor and Creditor Law ("DCL") § 278, "a fraudulent conveyance may be set aside on behalf of a creditor

whose claim has matured 'as against any person except a purchaser for fair consideration without

knowledge of the fraud at the time of the purchase.'" *Sardis v. Frankel*, 978 N.Y.S.2d 135, 141

(1st Dep't 2014) (quoting DCL § 278). A conveyance is "constructively fraudulent," and thus

subject to turnover, where a plaintiff can establish "(1) that the conveyance was made without

fair consideration; (2) that the conveyor is a defendant in an action for money damages or that a

judgment in such action has been docketed against him; and (3) that the defendant has failed to

satisfy the judgment." *Mitchell v. Garrison Protective Servs., Inc.*, 579 F. App'x 18, 21 (2d Cir.

2014) (internal quotation marks and citation omitted); *see Grace v. Bank Leumi Trust Co. of

N.Y.*, 443 F.3d 180, 188 (2d Cir. 2006).[3]

> Debtor and Creditor Law § 272, in turn, defines "fair consideration" as follows:

> Fair consideration is given for property, or obligation, (a) When in exchange for
> such property, or obligation, as a fair equivalent therefor, and in good faith, property
> is conveyed or an antecedent debt is satisfied, or (b) When such property, or
> obligation is received in good faith to secure a present advance or antecedent debt
> in amount not disproportionately small as compared with the value of the property,
> or obligation obtained.

> Addressing the fair consideration standard, the Second Circuit has stated that it "'is

profitably analyzed as follows: (1) the recipient of the debtor's property must either (a) convey

property in exchange or (b) discharge an antecedent debt in exchange; and (2) such exchange

must be a 'fair equivalent' of the property received; and (3) such exchange must be 'in good

faith.'" *In re Sharp*, 403 F.3d at 53 (quoting *HBE Leasing Corp. v. Frank*, 61 F.3d 1054, 1058–

59 (2d Cir. 1995) ("HBE Leasing II")); *accord Sardis*, 978 N.Y.S.2d at 141 ("'Fair

consideration' under Debtor and Creditor Law § 272 is not only a matter of whether the amount

---

[3] Anza LLC claims that, to succeed on a turnover motion, the creditor must prove that the debtor
was insolvent or undercapitalized. *See* Resp. Br. at 17–28. That is wrong. *See* NY DCL § 273-a
(McKinney); *see also In re Deyett*, 16 Misc. 3d 1124 (A), at *6 ("insolvency is not the criteria
for application of Debtor and Creditor Law 273-a").

given for the transferred property was a 'fair equivalent' or 'not disproportionately small,' . . . but whether the transaction is made 'in good faith.'"). The requirement of good faith "is imposed on both the transferor and the transferee." *Sardis*, 978 N.Y.S.2d at 141.

While the burden of establishing a fraudulent conveyance initially lies with the creditor, under New York law, the burden shifts where the challenged transfers are shown to have been made between parties such that "information about the consideration paid is exclusively within the knowledge of the parties to the transfer"; in these circumstances, "the parties to the transfer have the burden of establishing that the consideration was fair." *Greystone Bank v. Neuberg*, No. 10-CV-5225 ETB, 2011 WL 3841542, at *3 (E.D.N.Y. Aug. 25, 2011*); see also United States v. McCombs*, 30 F.3d 310, 324 (2d Cir. 1994) (collecting cases); *Gelbard v. Esses*, 465 N.Y.S.2d 264, 268 (1983) ("[W]here the creditor asserts that the transferees paid insufficient consideration and the evidentiary facts as to the nature and value of the consideration are within the transferees' control, the burden of coming forward with evidence disclosing . . . the fairness of the consideration . . . , should be cast upon the transferees."). As the Second Circuit has explained, "New York Law creates a presumption of fraud in fraudulent conveyance cases . . . where the conveyance was made without evidence of any tangible consideration." *McCombs*, 30 F.3d at 325. In instances where the allegedly fraudulent conveyance took the form of an intra-family transfer, courts have been particularly apt to shift the burden to prove fair consideration to the parties to the transfer. *See, e.g., id.* at 325; *Greystone*, 2011 WL 3841542, at *3; *United States v. Alfino*, 34 F. Supp. 2d 827, 845 (E.D.N.Y. 1999) ("Courts view intra-family transfers made without any signs of tangible consideration as presumptively fraudulent.").

## C.    Standards Governing a Motions to Confirm an Attachment

To succeed on a motion to confirm an order of attachment, a plaintiff must establish "1) a ground for the attachment, 2) the existence of a cause of action, 3) the probability that it will

succeed on the merits, 4) the need for continuing the levy, and 5) the probability that the amount

demanded from the defendants exceeds their potential counterclaims." *Merrill Lynch Futures*

*Inc. v. Kelly*, 585 F. Supp. 1245, 1249 (S.D.N.Y. 1984); *see also ITC Entm't, Ltd. v. Nelson Film*

*Partners*, 714 F.2d 217, 223 (2d Cir. 1983); *Aer Aerotron, Inc. v. Afro-Am. Int'l*, No. 91 CIV.

0843 (JSM), 1991 WL 79145, at *5 (S.D.N.Y. May 6, 1991).

## III.     Discussion

### A.     Tube City's Turnover Motion

Tube City has undisputedly satisfied two of the three elements of constructive fraud.

First, at the time of each challenged transfer, the transferring entity, Anza LLC, was either "a

defendant in an action for money damages" (*i.e.*, the arbitration initiated by Tube City on

October 5, 2012) or, as to the later transfers, had had a money damages judgment docketed

against it (by this Court based on the arbitral Award).  Second, Anza LLC has "failed to satisfy

the judgment."  *See Mitchell*, 579 F. App'x at 21.

As to the third element required for a turnover motion to prevail — that the transfer have

been made without fair consideration — each transfer by Anza LLC, as the facts below

demonstrate, was made under circumstances giving rise to a presumption of fraud.  Each transfer

was made either intra-family (*i.e.* to Anza or his family) or to an Anza family trust (JVA

Partners) or an Anza family-owned company (Omni).  In addition, each transfer lacked evidence

of tangible consideration, and was of a nature such that the information surrounding the transfer

– including why it occurred and what, if any, consideration was paid in return for it — was

known exclusively by the parties to the transfer. *See, e.g.*, *McCombs*, 30 F.3d at 325; *Greystone*,

2011 WL 3841542, at *3; *Alfino*, 34 F. Supp. 2d at 845.

Accordingly, under New York law, whether each transfer was constructively fraudulent,

so as to justify turnover of a corresponding sum of the transferee's attached funds to Tube City in

satisfaction of its judgment against Anza LLC, turns solely on a single question:  Has Anza LLC

come forward with evidence that raises a genuine issue of triable fact whether the transferee in

question gave fair consideration to Anza LLC, within the meaning of DCL § 272, in return for

the transfer?  As the following review demonstrates, the answer, as to each transfer, is no.

> 1.      **Transfers to JVA Partners**

Transferee JVA Partners is the "operating arm" of Joseph Anza's family trust, created as

a "holding company" for the benefit of Anza and his family.  *See* Dkt. 28, Ex. 5 ("Anza Dep.") at

53–54.  ("JVA" stands for Anza's initials.  *Id.*)  As developed below, JVA Partners was used

during the period in question essentially as a kitty account for Anza, who controlled it and drew

upon it to pay for his family's personal expenses, including cable television bills, wireless

charges, grocery store visits, entertainment expenses, online shopping bills, and car insurance

fees.  *See* Gunnell Decl., Ex. 24.[4]  Despite the overwhelming documentary evidence that Anza

used the JVA Partners entity in this manner, he denied under oath at his deposition that he had

ever "use[d] JVA Partners for [his] personal expenses."  Anza Dep. 71.

---

[4] Among the many of Anza's personal and family expenses for which JVA Partners paid, JVA
Partners spent $90.29 at Old Navy on December 24, 2014; $361.59 at Lord & Taylor in
Danbury, Connecticut, on December 24, 2012; $218.49 at Wholefoods Market in Fairfield,
Connecticut, on July 14, 2013; $232.91 at the Apple Store in Greenwich, Connecticut, on July
21, 2013; and monthly payments of $83.20 in telephone bills to Vonage Wireless and $3,095 to
Green's Farms Nursery School in Westport, Connecticut.  JVA Partners also covered $832.50 in
recurring payments to Geico Auto Insurance and the costs of numerous acquisitions at Home
Depot.  *See* Gunnell Decl., Ex. 24.  JVA Partners's records reflect numerous expenditures at bars
and liquor stores, including $75.06 at the Imperial Vintnor wine store in Manhattan on March 12,
2014; $106.33 at the Cork N Barrel liquor store in Newtown, Connecticut, on April 11, 2012;
$1,401.64 at the Cavo Lounge in Astoria, New York, on July 21, 2014; and $20.96 at Hooters in
Anderson, South Carolina, on February 25, 2014.  *Id.*  JVA Partners also paid for a number of
expenses associated with recreational trips, including $134.87 at the Mohawk Mountain ski
resort in Cornwall, Connecticut, on March 9, 2015; and $169.60 at the visitor center of the
Willett Bourbon distillery in Bardstown, Kentucky, on March 16, 2015.  *Id.*

       a.      *Direct Transfers to JVA Partners*

On three occasions between July and September 2013, Anza LLC transferred money to JVA Partners's bank account at JP Morgan Chase. The three transfers totaled $16,847.50. *See* Gunnell Decl., Ex. H. Anza personally manages, and is the sole signatory on, JVA Partners's bank account. Gunnell Decl., Ex. 11. Because Anza LLC's payments were made under the direction of a corporate insider (Anza) who was in control of the transferee (JVA Partners), the burden shifts to Anza LLC to show that the transfers were made for fair consideration. *See Greystone Bank*, 2011 WL 3841542, at *3.

Anza LLC fails to do so. Attempting to explain these transfers, its principal, Anza, suggests in his affidavit that the "odd amount" of the transfers indicates that they represent "payment for a specific invoice." Anza Aff. ¶¶ 59–60. He suggests that the transfers may have represented compensation to him for consulting services that he, in his capacity at JVA Partners, provided to Anza LLC. *Id.*

For several reasons, Anza's generalized and equivocal defense of these transfers fails to raise an issue of triable fact as to whether they were made for fair consideration. To begin with, contrary to Anza's description, only one of the three transfers was of an "odd amount" — it was for $5,847.50. The other two were in round numbers: $5,000 and $6,000, respectively.[5] More significantly, Anza fails completely to substantiate his claim that, on behalf of JVA Partners, he provided "consulting services" to Anza LLC. He cannot recall any such concrete services that he performed in his capacity as principal of the family partnership, let alone services performed in exchange for Anza LLC's three payments to that partnership. *See* Anza Aff. ¶ 59. Nor does

---

[5] These were: a July 29, 2013, transfer of $5,847.50; an August 16, 2013, transfer of $5,000; and a September 24, 2013, transfer of $6,000. *See* Gunnell Decl., Ex. H.

Anza offer any corroboration (*e.g.*, contemporaneous documentation, or testimony from percipient witnesses) of such "consulting services," or that the three transfers were made as consideration for the services. He offers only the lame conjecture that the payments must have been made for "*some* consideration (although I do not recall precisely what that was)." *Id.* ¶ 60. These statements are insufficient on their face to create a triable issue of fact. And even if they were sufficient, they would not be cognizable as a matter of law, because they are at odds with Anza's earlier deposition testimony, in which he was unable to explain the conveyances to JVA Partners. Anza Dep. 24.

For these reasons, Anza LLC has failed to raise a genuine issue of triable fact as to whether there was fair consideration given for the $16,847.50 which JVA Partners received from Tube City's debtor, Anza LLC. These three transfers, totaling $16,847.50, are therefore, fraudulent conveyances.

> *b.    Indirect Transfers to JVA Partners through Cyprus Entities*

In addition to transferring money directly to JVA Partners, Anza LLC, after Tube City initiated the arbitration, indirectly made payments to JVA Partners, each routed through a foreign entity under its (and by extension Anza's) control. These entities included two Anza-affiliated entities based in Cyprus, Greece: Anza Capital Cyprus Limited I and Anza Capital Cyprus Limited II (the "Anza Cyprus Entities"). Gunnell Decl., Ex. 13. Specifically, in October 2012, and August and September 2013, Anza LLC made three payments, totaling $265,000, to Anza Cyprus Entities. *Id.* Then, in November 2014 and January and March 2015, the Anza Cyprus Entities made three payments, totaling $50,000, to JVA Partners. Gunnell Decl., Ex. 14.[6]

---

[6] These were: a November 7, 2014, payment of $10,000; a January 22, 2015, transfer of $25,000; and a March 6, 2015, transfer of $15,000. *Id.*

In his affidavit, Anza seeks to explain the Anza Cyprus Entities' payment of $50,000 to JVA Partners as representing the family partnership's "distributive share of transactional profits" in its capacity as a one-third shareholder of the former entity. Anza Aff. ¶ 63. But Anza offers no documentary corroboration for this claim. And, as a matter of law, this claim cannot be credited because it squarely contradicts Anza's earlier deposition testimony to the effect that he does not know (1) of any company that JVA Partners might have owned, Anza Dep. 54–55, or (2) anything about the Anza Cyprus Entities (including whether such entities even existed), *id.* at 72–73.

Also unavailing is Anza's claim that, because the Anza Cyprus Entities transferred the $50,000 to JVA Partners more than two years after Anza LLC funded the Anza Cyprus Entities, it is not reasonable to infer "any connection between the two [transfers]." Anza Aff. ¶ 63. As a matter of law, it is Anza LLC that has the burden to show fair consideration for these conveyances, which began with a conveyance from the judgment debtor and ended with a $50,000 transfer to the family trust of the judgment debtor's principal. *See Greystone Bank*, 2011 WL 3841542, at *3. And for the reasons already stated, Anza's vague, unsubstantiated, and self-contradictory statements cannot establish fair consideration for either step in this sequence of transactions. *See Hayes*, 84 F.3d at 619. The indirect transfers of $50,000 to JVA Partners, therefore, are also fraudulent conveyances.

### 2.       Transfers to Omni

Omni is a business entity co-owned by Anza and his brother, Vincent J. Anza. Anza Dep. 16. According to Anza, Omni was created in 2011, shortly before the arbitration was filed, as a "retail and wholesale seller of steel products," similar to Anza LLC. Anza Aff. ¶ 66. Asked about Omni at his deposition, Anza initially denied recalling any instance in which Omni and

Anza LLC had done business together.  Anza Dep. 90.  Later, however, he claimed that the two

companies had done business together on at least three separate occasions, including two in

which Anza LLC "took care of selling [stainless steel doors and siding] for Omni."  *Id.* at 92–93.

### a.   The December 2012 Transfer to Omni

Anza LLC's bank records reveal that, in December 2012, Anza LLC transferred $15,500

to Omni.  Gunnell Decl., Ex. 15.  At his deposition, Anza denied any memory or knowledge of

these payments.  Anza Dep. 94.  In his affidavit opposing turnover, however, Anza now claims

that this transfer was actually a "loan" to Omni to Anza LLC, which Omni was required to repay

in 10 installments of $1,550, plus interest.  Anza Aff. ¶ 68.  In support, Anza points to bank

account statements showing that, between December 2012 and February 2013, Omni made nine

payments to Anza LLC, each for $1,550, and an additional payment of $5,800.  Anza Aff., Ex. 5.

Inspection of Anza LLC's Chase bank records actually show two other payments from Omni to

Anza LLC during this period, not flagged by Anza: a 10th payment of $1,550 on February 19,

2013, and a payment of $1,145.91 on January 31, 2013.  *See* Dkt. 40, Ex. 7.

Because there are repayments, the claim of a "loan" is less transparently bogus than

Anza's other justifications for his conveyances.  Nonetheless, considering the evidence as a

whole, the record fails to show that the $15,500 payment from Anza LLC to Omni in December

2012 was a loan made for fair consideration.  Anza's affidavit claiming that there was such a

loan cannot be credited because it repudiates his sworn deposition testimony.  And Anza LLC

has not come forward with any documentation of the supposed loan.  There is, for example, no

written loan agreement, or even an exchange of contemporaneous communications on the

subject, that could support a finding of an arms-length loan arrangement.  There is no testimony

from Vincent Anza, Anza's co-owner and brother, on this point.  Nor does Anza LLC present

any evidence as to why a loan would have been made between these companies at the time.

Further, the erratic timing of the payments from Omni to Anza LLC is not consistent with

a coherent payment plan of the sort one might expect for a legitimate business loan.

Finally, the amount of the payments, on close review, does not support Anza's present

account.  If the 10 payments of $1,550 each were all that Omni repaid to Anza LLC in return for

the loan, the loan would be an interest-free loan, which would not support a finding of "fair

consideration" for the $15,500 transfer from Anza LLC to Omni.  On the other hand, if the

additional two conveyances from Omni to Anza LLC are considered interest, as Anza now urges,

these would together constitute an interest rate of 44% for the 107-day loan period, far beyond

New York's benchmark for criminal usury of 25%.  *See* N.Y. Penal Law § 190.40 (McKinney).

It is not credible that Anza and his brother would have acceded to such an exorbitant interest rate

on behalf of the company they co-owned.

For these reasons, Anza LLC has not met its burden to show fair consideration for this

transfer of $15,500.  It, too, is a fraudulent conveyance.

> b. *The June and July 2013 Transfers to Omni*

Anza LLC's bank records reveal that, on three occasions in June and July 2013, Anza

LLC transferred money to Omni, totaling $50,000.  Gunnell Decl., Ex. 15.[7]

---

[7] These were: a June 21, 2013, transfer of $20,000; a June 26, 2013, transfer of $20,000; and a
July 26, 2016, transfer of $10,000.  *Id.*

At his deposition, Anza had no explanation for these transfers. *See* Anza Dep. 93.[8]  In his affidavit, however, Anza now states that they reflected compensation to Omni from Anza LLC in return for scrap steel that Omni had sold to Anza LLC.  Anza Aff. ¶ 70.  Because that claim is inconsistent with Anza's deposition testimony, it is not cognizable.  In any event, Anza's self-serving claim that there was a business purpose for these transfers fails to give rise to a triable issue of fact.  There is no documentary corroboration for it.  And Anza, a corporate insider with regard to both entities involved in this transaction, fails to explain why (1) Anza LLC had occasion to pay $50,000 to Omni if the Anza LLC was truly selling the steel on behalf of Omni; (2) if these payments were compensation for the two steel door and siding transactions, that there were three — as opposed to two — payments; (3) the three payments were in round numbers (two for $20,000 and one for $10,000), whereas Anza has elsewhere claimed that the "odd amount" of a transfer was evidence that it related to an authentic business transaction; and (4) he has no documentary proof of this purported transaction between his two steel companies.

For these reasons, Anza LLC has not met its burden to show fair consideration for the transfers totaling $50,000 to Omni.  These, too, are fraudulent conveyances.

### 3.    Transfers to Joseph and Alexandra Anza

Anza LLC's bank and credit card records show that after Tube City initiated the arbitration against it, Anza LLC transferred money, on numerous occasions, to Anza himself, and to his wife, Alexandra Anza.  Each such transfer is presumptively fraudulent, as an intra-family transfer at the direction of a corporate insider (Anza) as to which the only possible knowledge of any consideration would lie with the parties to the transfer. *See Greystone*, 2011

---

[8] At his deposition, Anza speculated that the December 2012 payment, discussed above, might have related to the transactions between Omni and Anza LLC regarding the steel doors and siding, Anza Dep. 93, but made no mention of these latter two payments.

WL 3841542 at *3; *McCombs*, 30 F.3d at 325; *Alfino*, 34 F. Supp. 2d at 845.  The burden is

therefore on Anza LLC to raise a triable issue of fact as to whether these transfers were

supported by consideration.

The transfers fall into six distinct categories, which the Court addresses in turn.

###### a.   Direct Transfers to Anza

Anza LLC made two payments directly to Anza himself.  First, on October 25, 2012, less

than three weeks after Tube City initiated the arbitration, Anza LLC deposited $2,000 directly

into Anza's bank account.  Gunnell Decl., Ex. 6.  Second, deposit slips signed by Anza on behalf

of Anza LLC between December 2012 and September 2013 show that Anza personally withdrew

cash in the amount of $3,000 from the company's account.  Gunnell Decl., Ex. 7.

Anza LLC again fails to come forward with evidence sufficient to create a triable issue of

fact.  In his affidavit, Anza states that he found it "hardly worth the time and effort required to

track down the reasons for those relatively small transactions," Anza Aff. ¶ 37, but nonetheless

volunteers that the withdrawals "appear to all be for legitimate travel expenses."  *Id.*  However,

neither he nor Anza LLC has produced any substantiation of the claim that these expenses

covered bona fide business travel for the benefit of Anza LLC, or were supported by fair

consideration to Anza LLC.  These transfers, totaling $5,000, were therefore fraudulent

conveyances.

###### b.   Transfers to Fund Anza's European Vacation

Anza LLC's credit card statements reflect payments during the summer of 2013, by Anza

LLC, of (1) $9,000, to "Santinovo Poggibonsi," an Italian luxury bed and breakfast resort; (2)

$3,000, to pay for Avis car rentals in Rome; and (3) hundreds of additional dollars in airfare, taxi

cabs, and hotels in Budapest, Hungary. *See* Gunnell Decl., Ex. 9 (Anza LLC's credit card statements at Chase).

At his deposition, Anza testified that he had gone to Europe with his wife that summer, including a trip to Italy to visit his father. Anza Dep. 132–33. In his affidavit, Anza now repudiates his admission that the trip was personal in nature: He claims the trip's purpose was to explore opportunities for Anza LLC to invest in bed and breakfast establishments, like the one at which he and his wife had stayed in at Anza LLC's expense. Anza Aff. ¶ 44. Anza explains that Anza LLC was originally intended to be a "real estate investment management company," that it had owned and managed five commercial properties in New York City, *id.* ¶ 7, and that the impetus for his and his wife's trip to Italy and Hungary was to "resurrect" that business model. *Id.* ¶ 18.

For multiple reasons, these statements fail to create a triable issue of fact. First, they contradict Anza's previous testimony — both as to the personal nature of the trip and as to the effect that Anza LLC had never owned any real estate or real property. Anza Dep. 65. Second, Anza offers only scant evidence in ostensible support of his account that the trip to Italy was a business trip; namely, four undated photographs showing a door, an exhaust pipe, a window, and some plants. Anza Aff., Ex. 4. These records prove nothing about the nature of the Anzas' trip. Conspicuously absent are any records substantiating Anza's claim that he was in Italy and Hungary for the purpose of exploring investment opportunities for Anza LLC. Far from establishing that point, Anza's anemic production — of four quotidian and unilluminating photographs — underscores the speciousness of his belated justification for these payments.[9]

---

[9] Similarly lacking is any corroboration of Anza's related claim that his wife had accompanied him on the European trip in her capacity as Anza LLC's "official photographer." Anza Aff. ¶ 47.

Anza LLC thus wholly fails to meet its burden to establish fair consideration with regard to these transfers of $15,860.36.  These, too, are fraudulent conveyances.

*c.     Transfers to Pay for the Lease of Anza's Audi*

Anza LLC's bank records further indicate that, after the arbitration was filed, it made 11 payments to Volkswagen Credit, totaling $8,116.48, all used towards the lease of Anza's personal car, an Audi.  Gunnell Decl., Ex. 4.[10]  At his deposition, Anza admitted that he had used the Audi for "personal purposes," and that it was the only car that he drove in 2012, the year when the series of 11 payments began.  Anza Dep. 90.

In his affidavit, Anza now reverses course.  He claims that he used the Audi "99%" of the time for "business purposes," and that his "personal car" during the time period in question was actually a Porsche.  Anza Aff. ¶¶ 32–33.  Like others of Anza's stated justifications, this belated claim is not cognizable, because it repudiates his deposition testimony, in which Anza admitted the car's personal use.  And Anza LLC fails to support this claim with documentary (or indeed any) evidence.  Thus, Anza LLC has not met its burden to create a triable issue of fact with respect to these conveyances, too.  These transfers in the amount of $8,116.48, too, are fraudulent conveyances.

*d.     Transfers Related to Anza's Manhattan Apartment*

Between October 2012 and April 2013, Anza LLC made seven monthly payments of $2,095.70 to Chase Home Finance, totaling $14,669.90, to pay mortgage obligations on Anza's Manhattan condominium, held in his name, on East 45th Street in New York City.  During this

---

[10] These were: payments of $1,254.25, made on November 30, 2012, and July 11, 2013; separate payments of $611.83, made on December 17, 2012, January 15, 2013, February 14, 2013, April 22, 2013, May 16, 2013, and September 6, 2013; an April 9, 2013, payment of $673.01; an August 2, 2013, payment of $642.42; and a September 7, 2013, payment of $621.57.  Gunnell Decl., Ex. 4.

period, Anza LLC paid an additional $3,770.06 to Caran Properties, the building's manager, in condominium association fees. Gunnell Decl., Ex. 1, 4. These payments ceased after April 2013, when the condominium was sold, at which time the proceeds from the sale went directly to JVA Partners for the benefit of Anza personally. *See* Gunnell Decl., Ex. 8.

In his affidavit, Anza claims that the payments served as "rent" for Anza LLC's use of the condo as a "very private, and very upscale, office." Anza Aff. ¶ 25. But Anza LLC has not come forward with any evidence — beyond Anza's self-serving claim — that the apartment was used by Anza LLC for business purposes, or that Anza LLC entered into any sort of formal lease agreement for the use of the apartment. Nor has Anza LLC adduced any evidence that it made "renovations" to the apartment to facilitate its business operations there, as Anza claims. Anza Aff. ¶ 26. Anza's threadbare assertions therefore fall far short of substantiating that these payments were for a business, as opposed to a personal, purpose. *See, e.g.*, *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 104–05 (2d Cir. 2011); *Jeffreys v. City of New York*, 426 F.3d 549, 544 (2d Cir. 2005); *Magesty Sec. Corp. v. U.S. I.R.S.*, No. 10 CIV. 0638 ALC, 2012 WL 1425100, at n.3 (S.D.N.Y. Apr. 24, 2012) (claims that transfers were intended to pay a business's rent should not be credited absent "hard evidence" supporting such a claim, such as written lease agreements, tax forms, or other financial disclosure documents.)

Anza LLC therefore has not met its burden to show fair consideration for the payments of $19,439.96 that it made with respect to the 45th Street condominium. These, too, were fraudulent conveyances.

    *e.*   *Transfers to pay Anza's American Express Credit Card*

Anza LLC's Chase bank records show that it made numerous payments between October 2012 and November 2013 to pay charges incurred on an American Express credit card. These

20

payments totaled $96,798.42.  Gunnell Decl., Ex. 8.  At his deposition, Anza admitted that he,

personally, held an American Express card — and that Anza LLC did not, but instead used and

maintained a Chase credit card.  *See* Anza Dep. 66–67, 82–83.

Explicitly repudiating this testimony, Anza now claims in his affidavit that Anza LLC

did, in fact, maintain an American Express credit card, which it used exclusively for business

purposes, and that Anza LLC used this card to incur the $96,798.42 in charges.  Anza Aff. ¶ 41.

In support, Anza attaches the first page of a 13-page credit card statement for an American

Express card held jointly in his and in Anza LLC's name.  *Id.*, Ex. 3.  However, Anza does not

provide, or account for the absence of, the 12 remaining pages of the statement, to which he

presumably had and has access, and which could presumably corroborate — or defeat — his

claim that the card was used solely for business expenses.  Under these circumstances, Anza's

declaration fails to give rise to a triable issue of fact, both because it is inconsistent with his

deposition testimony and because Anza's claim that his expenses were for business is utterly

unsubstantiated — indeed, Anza LLC fails to identify a single such expense.

Anza LLC's payments in the amount of $96,798.42 of these credit card expenses of

Anza's were, therefore, also fraudulent conveyances.

f.     *Transfer to Alexandra Anza*

In October 2012, Anza LLC transferred $2,000 to Anza's wife, Alexandra Anza.

Gunnell Decl., Ex. 10.  At his deposition, Anza testified that the $2,000 was intended to

compensate his wife for the "PR services" that she had performed for Anza LLC — specifically,

receiving invitations to parties to which she and Anza had been invited, and responding "yes" to

those invitations using her laptop.  Anza Dep. 110.  In his affidavit, Anza now claims that

"[h]aving had time to reflect on the price nature of her services," he remembers that his wife also

21

updated Anza LLC's "profile" to send to potential investors.  Anza Aff. n.8.  Paying his wife to answer party invitations, Anza urges, was "*much* less expensive for [Anza LLC] . . . than to employ a full-time employee (or even a part-time employee) to perform those services."  *Id.* ¶ 54.

These claims fall far short of overcoming the presumption of fraud as to this intra-family transfer.  There is no corroboration of Anza's claim that his wife performed services of any kind for Anza LLC, let alone those to which Anza points.  And Anza's claim that his wife's services in responding to party invitations and updating Anza LLC's profile were fairly valued to Anza LLC at $2,000 is risible on its face.

The transfer of $2,000 to Alexandra Anza was, therefore, also a fraudulent conveyance.

**B.      Confirmation Motion**

For the reasons above, and for those underlying the earlier entry of judgment for Tube City and the issuance of the Attachment Order, Tube City's motion for confirmation of the present attachments is clearly merited.  There is, however, one outstanding issue yet to be resolved, involving tabulation of the sum total of the amounts due to Tube City.  The Court cannot, of course, sustain a turnover or attachment beyond that needed to make Tube City whole. *See, e.g.*, *Merrill Lynch Futures Inc.*, 585 F. Supp. at 1249.  The Court has held, based on the arbitral Award, that Tube City is entitled to judgment of $238,949.84.  Tube City is, separately, due (1) post-judgment interest and (2) reasonable attorneys' fees.  On the present record, the Court is unable to determine with assurance the amount of these sums.  Therefore, the Court cannot assess the total amount to which Tube City is due, including these inputs, or how it

compares to the total fraudulent transfers found above ($279,562.72),[11] or to the total amount of assets that have been attached ($381,910.22).

The Court, therefore, while granting Tube City's Turnover and Confirmation motions, will stay any turnover to Tube City pending the Court's resolution, after expedited briefing, of these calculative issues and other issues relating to the mechanics by which turnover is to be accomplished. An order identifying the issues to be briefed will follow shortly.[12]

## CONCLUSION

For the foregoing reasons, Tube City's Turnover Motion and Confirmation Motions are granted. Turnover, however, is stayed pending the Court's resolution of issues relating, *inter alia*, to the calculation of the sum to be turned over, which the parties will brief on a schedule to be set in a separate order.

Subject to that limitation, as to the Turnover Motion, the Court finds that the following sums (totaling $279,562.72) were fraudulently conveyed from Anza LLC to the following Transferees, so as support turnover of these funds: (1) Joseph Anza, in the amount of $145,215.22; (2) Alexandra Anza, in the amount of $2,000; (3) JVA Partners, in the amount of $66,847.50; and (4) Omni Steel Supply LLC, in the amount of $65,500.

---

[11] In its brief, Tube City totals the fraudulent conveyances as $278,062.72. *See* Pet. Turn. Br. at 29–30. Tube City is directed, in its forthcoming letter to the Court, to explain this discrepancy.

[12] In light of the above rulings, the Court perceives no need to address Tube City's alternative argument that the assets of Joseph Anza and JVA Partners can be reached by means of an "alter ego" theory of liability. In the event that any party believes otherwise, they may explain the basis for this view to the Court in their upcoming brief.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: October 6, 2016
       New York, New York